ANDRUS, SECRETARY OF THE INTERIOR, ET AL. *v.*
SIERRA CLUB ET AL.

No. 78–625.   Argued April 18, 1979—Decided June 11, 1979

Brennan, J., delivered the opinion for a unanimous Court.

*Assistant Attorney General Harmon* argued the cause for petitioners. On the briefs were *Acting Solicitor General Wallace, Acting Assistant Attorney General Sagalkin, Deputy Solicitor General Barnett, Peter R. Steenland, Jr., Raymond N. Zagone,* and *Dirk D. Snel.*

*James Hillson Cohen* argued the cause and filed briefs for respondents.*

Mr. Justice Brennan delivered the opinion of the Court.

The question for decision is whether § 102 (2)(C) of the National Environmental Policy Act of 1969 (NEPA), 83 Stat.

*Ronald A. Zumbrun, Robert K. Best,* and *Raymond M. Momboisse* filed a brief for the Pacific Legal Foundation as *amicus curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed by *Roberts B. Owen* and *Charles H. Montange* for the National Wildlife Federation et al.; and by *Mitchell Rogovin* and *David R. Boyd* for the Wilderness Society.

853, 42 U. S. C. § 4332 (2)(C), requires federal agencies to prepare environmental impact statements (EIS's) to accompany appropriation requests. We hold that it does not.

## I

NEPA sets forth its purposes in bold strokes:

> "The purposes of this Act are: To declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; to enrich the understanding of the ecological systems and natural resources important to the Nation . . . ." 83 Stat. 852, 42 U. S. C. § 4321.[1]

Congress recognized, however, that these desired goals could

---

[1] Section 101 (b) articulates these purposes with even greater particularity:

"In order to carry out the policy set forth in this Act, it is the continuing responsibility of the Federal Government to use all practicable means, consistent with other essential considerations of national policy, to improve and coordinate Federal plans, functions, programs, and resources to the end that the Nation may—

"(1) fulfill the responsibilities of each generation as trustee of the environment for succeeding generations;

"(2) assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings;

"(3) attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences;

"(4) preserve important historic, cultural, and natural aspects of our national heritage, and maintain, wherever possible, an environment which supports diversity and variety of individual choice;

"(5) achieve a balance between population and resource use which will permit high standards of living and a wide sharing of life's amenities; and

"(6) enhance the quality of renewable resources and approach the maximum attainable recycling of depletable resources." 83 Stat. 852, 42 U. S. C. § 4331 (b).

be incorporated into the everyday functioning of the Federal Government only with great difficulty. See S. Rep. No. 91–296, p. 19 (1969). NEPA therefore contains "action-forcing procedures which will help to insure that the policies [of the Act] are implemented." *Ibid.* See *Kleppe* v. *Sierra Club,* 427 U. S. 390, 409 (1976). Section 102 (2)(C) of the Act sets out one of these procedures:

> "The Congress authorizes and directs that, to the fullest extent possible . . . (2) all agencies of the Federal Government shall—
>
> .      .      .      .      .
>
> "(C) include in every recommendation or report *on proposals for legislation and other major Federal actions* significantly affecting the quality of the human environment, a detailed statement by the responsible official on—
> "(i) the environmental impact of the proposed action,
> "(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
> "(iii) alternatives to the proposed action,
> "(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and
> "(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented." 83 Stat. 853, 42 U. S. C. § 4332 (2)(C) (emphasis supplied).

The thrust of § 102 (2)(C) is thus that environmental concerns be integrated into the very process of agency decision-making. The "detailed statement" it requires is the outward sign that environmental values and consequences have been considered during the planning stage of agency actions.[2] If

---

[2] Of course, an EIS need not be promulgated unless an agency's planning ripens into a "recommendation or report on proposals for legislation [or] other major Federal actions significantly affecting the quality of the human

environmental concerns are not interwoven into the fabric of agency planning, the "action-forcing" characteristics of § 102 (2)(C) would be lost. "In the past, environmental factors have frequently been ignored and omitted from consideration in the early stages of planning .... As a result, unless the results of planning are radically revised at the policy level—and this often means the Congress—environmental enhancement opportunities may be foregone and unnecessary degradation incurred." S. Rep. No. 91–296, *supra*, at 20. For this reason the regulations of the Council on Environmental Quality (CEQ) require federal agencies to "integrate the NEPA process with other planning at the earliest possible time to insure that planning and decisions reflect environmental values . . . ." 43 Fed. Reg. 55992 (1978) (to be codified at 40 CFR § 1501.2).[3]

---

environment." 42 U. S. C. § 4332 (2)(C). See *Kleppe* v. *Sierra Club*, 427 U. S. 390 (1976). Moreover, although NEPA requires compliance "to the fullest extent possible," we have held that the duty to prepare an EIS must yield before "a clear and unavoidable conflict in statutory authority." *Flint Ridge Development Co.* v. *Scenic Rivers Assn.*, 426 U. S. 776, 788 (1976).

[3] CEQ regulations state that "[t]he primary purpose of an environmental impact statement is to serve as an action-forcing device to insure that the policies and goals defined in [NEPA] are infused into the ongoing programs and actions of the Federal Government. . . . An environmental impact statement is more than a disclosure document. It shall be used by Federal officials in conjunction with other relevant material to plan actions and make decisions." 43 Fed. Reg. 55994 (1978) (to be codified at 40 CFR § 1502.1).

In Exec. Order No. 11991, President Carter required the CEQ to issue regulations that included procedures "for the early preparation of environmental impact statements." 3 CFR 124 (1978). As a consequence, CEQ regulations provide:

"An agency shall commence preparation of an environmental impact statement as close as possible to the time the agency is developing or is presented with a proposal . . . so that preparation can be completed in time for the final statement to be included in any recommendation or report on the proposal. The statement shall be prepared early enough so that it

In 1974, respondents, three organizations with interests in the preservation of the environment,[4] brought suit in the Federal District Court for the District of Columbia alleging that § 102 (2)(C) requires federal agencies to prepare EIS's[5] to accompany their appropriation requests. Respondents named as defendants the Secretary of the Interior and the Director of the Office of Mangement and Budget (OMB), and alleged that proposed curtailments in the budget of the National Wildlife Refuge System (NWRS), 80 Stat. 927, 16 U. S. C. § 668dd, would "cut back significantly the operations, maintenance, and staffing of units within the System."[6] Complaint ¶ 17. The System is administered by the Fish and Wildlife Service of the Department of the Interior, and consists of more than 350 refuges encompassing more than 30 million acres in 49 States. The primary purpose of the NWRS is to provide a national program "for the restoration, preservation, development and management of wildlife and wildlands habitat; for the protection and preservation of endangered or threatened species and their habitat; and for the management of wildlife and wildlands to obtain the maximum benefits from these resources." 50 CFR § 25.11 (b)

can serve practically as an important contribution to the decisionmaking process and will not be used to rationalize or justify decisions already made. . . . For instance:

"(a) For projects directly undertaken by Federal agencies the environmental impact statement shall be prepared at the feasibility analysis (go-no go) stage and may be supplemented at a later stage if necessary. . . ." 43 Fed. Reg. 55995 (1978) (to be codified at 40 CFR § 1502.5).

[4] Respondents are the Sierra Club, the National Parks and Conservation Association, and the Natural Resources Defense Council, Inc.

[5] CEQ regulations define an "environmental impact statement" to mean "a detailed written statement as required by Sec. 102 (2)(C) of [NEPA]." 43 Fed. Reg. 56004 (1978) (to be codified at 40 CFR § 1508.11).

[6] See United States Fish and Wildlife Service, Final Environmental Statement: Operation of the National Wildlife Refuge System I–8 to I–9 (Nov. 1976).

(1978).[7]   Respondents alleged that the proposed budget cur-
tailments would significantly affect the quality of the human
environment,[8] and hence should have been accompanied by
an EIS prepared both by the Fish and Wildlife Service and
by OMB.[9]

The District Court agreed with respondents' contentions.
Relying on provisions of the then applicable CEQ guidelines,[10]

---

[7] The System is administered according to the provisions of several
statutes.   The most significant of these are the Fish and Wildlife Coordi-
nation Act of 1934, 48 Stat. 401, as amended, 72 Stat. 563, 16 U. S. C. § 661
*et seq.;* the Fish and Wildlife Act of 1956, 70 Stat. 1119, 16 U. S. C. § 742a
*et seq.;* the Migratory Bird Conservation Act, ch. 257, 45 Stat. 1222, as
amended, 16 U. S. C. § 715 *et seq.;* and the Endangered Species Act of
1973, 87 Stat. 884, 16 U. S. C. § 1531 *et seq.*

[8] Respondents brought suit on behalf of themselves, claiming that they
had organizational interests in monitoring and publicizing the management
of the NWRS, and on behalf of their members, alleging that the latter
used the NWRS for recreational and other purposes and would be affected
by the proposed budget curtailments.

[9] Respondents alleged that OMB had "significantly reduced the Interior
Department's request for appropriations for the operation of the National
Wildlife Refuge System during fiscal year 1974 and during other years
without preparing or considering the environmental-impact statement
required by NEPA."   Complaint ¶ 25.

Respondents also contended that § 102 (2) (B) of NEPA required OMB
to develop procedures to assure consideration of environmental factors in
the budget process.   Section 102 (2) (B) requires all federal agencies to
"identify and develop methods and procedures, in consultation with the
Council on Environmental Quality established by title II of this Act, which
will insure that presently unquantified environmental amenities and values
may be given appropriate consideration in decisionmaking along with
economic and technical considerations."   83 Stat. 853, 42 U. S. C.
§ 4332 (2) (B).

[10] At that time, CEQ was authorized by Exec. Order No. 11514, § 3 (h),
to issue nonbinding "guidelines to Federal agencies for the preparation
of detailed statements on proposals for legislation and other Federal actions
affecting the environment."   3 CFR 904 (1966–1970 Comp.).   These
guidelines stated that the "major Federal actions" to which § 102 (2) (C)
applied included "[r]ecommendations or favorable reports relating to leg-

and on the Department of the Interior's Manual,[11] the District Court held that "appropriation requests are 'proposals for legislation' within the meaning of NEPA," and also that "annual proposals for financing the Refuge System are major Federal actions which clearly have a significant effect on the environment." *Sierra Club* v. *Morton,* 395 F. Supp. 1187, 1188, 1189 (1975). The District Court granted respondents' motion for summary judgment, and provided declaratory and injunctive relief. It stated that the Department of the Interior and OMB were required "to prepare, consider, and disseminate environmental impact statements on annual proposals for financing the National Wildlife Refuge System." [12] App. to Pet. for Cert. 61a.

The Court of Appeals for the District of Columbia Circuit modified the holding of the District Court. The Court of Appeals was apprehensive because "[a] rule requiring preparation of an EIS on the annual budget request for virtually every ongoing program would trivialize NEPA." 189 U. S. App. D. C. 117, 125, 581 F. 2d 895, 903 (1978). Therefore, the Court of Appeals concluded that § 102 (2)(C) required

islation including requests for appropriations." 40 CFR § 1500.5 (a)(1) (1974). See § 1500.3.

[11] At that time the Department of the Interior's Manual, following CEQ's proposed guidelines, provided:

"The following criteria are to be used in deciding whether a proposed action requires the preparation of an environmental statement:

"A. Types of Federal actions to be considered include, but are not limited to:

"(1) Recommendations or favorable reports to the Congress relating to legislation, including appropriations." Department of the Interior Manual, § 516.5, 36 Fed. Reg. 19344 (1971).

[12] Without additional discussion, the District Court also stated that the Director of OMB was required "to develop formal methods and procedures which will, with respect to [OMB]'s own administrative actions and proposals, identify those agency actions requiring environmental statements to be prepared, considered, and disseminated." App. to Pet. for Cert. 62a. See n. 9, *supra.*

the preparation of an EIS only when an appropriation request accompanies "a 'proposal' for taking new action which significantly changes the status quo," or when "the request for budget approval and appropriations is one that ushers in a considered programmatic course following a programmatic review." 189 U. S. App. D. C., at 125, 581 F. 2d, at 903. Section 102 (2)(C) would thus have no application to "a routine request for budget approval and appropriations for continuance and management of an ongoing program." 189 U. S. App. D. C., at 125, 581 F. 2d, at 903. The Court of Appeals held, however, that there was no need for injunctive relief because the Fish and Wildlife Service had completed during the pendency of the appeal a "Programmatic EIS" that adequately evaluated the environmental consequences for the NWRS of various budgetary alternatives.[13] *Id.,* at 126, 581 F. 2d, at 904. See United States Fish and Wildlife Service, Final Environmental Statement: Operation of the National Wildlife Refuge System (Nov. 1976).[14]

We granted certiorari, 439 U. S. 1065 (1979), and we now reverse.

## II

NEPA requires EIS's to be included in recommendations or reports on both "proposals for legislation . . . significantly affecting the quality of the human environment" and "proposals for . . . major Federal actions significantly affecting the quality of the human environment." 42 U. S. C. § 4332 (2)(C). See CEQ regulations, 43 Fed. Reg. 56001 (1978) (to be codified at 40 CFR § 1506.8 (a)). Petitioners argue, however, that the requirements of § 102 (2)(C) have no application to the budget process. The contrary holding of the

[13] Respondents do not now challenge this holding.

[14] The Court of Appeals also affirmed what it took to be the District Court's declaratory relief requiring OMB "to adopt procedures and appropriate regulations to comply with the obligations NEPA imposes on the budget process . . . ." 189 U. S. App. D. C., at 127, 581 F. 2d, at 905. See n. 12, *supra.*

Court of Appeals rests on two alternative interpretations of § 102 (2)(C). The first is that appropriation requests which are the result of "an agency's painstaking review of an ongoing program," 189 U. S. App. D. C., at 125, 581 F. 2d, at 903, are "proposals for legislation" within the meaning of § 102 (2) (C). The second is that appropriation requests which are the reflection of "new" agency initiatives constituting "major Federal actions" under NEPA, are themselves "proposals for . . . major Federal actions" for purposes of § 102 (2)(C). We hold that neither interpretation is correct.

## A

We note initially that NEPA makes no distinction between "proposals for legislation" that are the result of "painstaking review," and those that are merely "routine." When Congress has thus spoken "in the plainest of words," *TVA* v. *Hill*, 437 U. S. 153, 194 (1978), we will ordinarily decline to fracture the clear language of a statute, even for the purpose of fashioning from the resulting fragments a rule that "accords with 'common sense and the public weal.'" *Id.*, at 195. Therefore, either all appropriation requests constitute "proposals for legislation," or none does.

There is no direct evidence in the legislative history of NEPA that enlightens whether Congress intended the phrase "proposals for legislation" to include requests for appropriations. At the time of the Court of Appeals' decision, however, CEQ guidelines provided that § 102 (2)(C) applied to "[r]ecommendations or favorable reports relating to legislation including requests for appropriations." 40 CFR § 1500.5 (a)(1) (1977).[15] At that time CEQ's guidelines were advi-

---

[15] CEQ had taken this position from the first draft of its guidelines. CEQ was required by President Nixon to issue guidelines on March 5, 1970. See Exec. Order No. 11514, 3 CFR 902 (1966–1967 Comp.). On April 30, 1970, CEQ promulgated interim guidelines which provided that "major Federal actions" included "[r]ecommendations or reports relating to legislation and appropriations." Council on Environmental

sory in nature, and were for the purpose of assisting federal agencies in complying with NEPA. § 1500.1 (a).

In 1977, however, President Carter, in order to create a single set of uniform, mandatory regulations, ordered CEQ, "after consultation with affected agencies," to "[i]ssue regulations to Federal agencies for the implementation of the procedural provisions" of NEPA. Exec. Order No. 11991, 3 CFR 124 (1978). The President ordered the heads of federal agencies to "comply with the regulations issued by the Council . . . ." *Ibid.* CEQ has since issued these regulations, 43 Fed. Reg. 55978–56007 (1978),[16] and they reverse CEQ's prior interpretation of § 102 (2)(C). The regulations provide specifically that " '[l]egislation' includes a bill or legislative proposal to Congress . . . but does *not* include requests for appropriations." 43 Fed. Reg. 56004 (1978) (to be codified at 40 CFR § 1508.17). (Emphasis supplied.) CEQ explained this reversal by noting that, on the basis of "traditional concepts relating to appropriations and the budget cycle, considerations of timing and confidentiality, and other factors, . . . the Council in its experience found that preparation of EISs is ill-suited to the budget preparation process."[17] 43 Fed. Reg., at 55989.

Quality, First Annual Report: Environmental Quality 288 (1970). On April 23, 1971, the guidelines were revised to state that "major Federal actions" included "[r]ecommendations or favorable reports relating to legislation including that for appropriations." 36 Fed. Reg. 7724 (1971). On August 1, 1973, the guidelines were once again revised, this time to the form noted by the Court of Appeals. 38 Fed. Reg. 20551 (1973).

Relying on the CEQ guidelines, two prior decisions by Courts of Appeals have both interpreted "proposals for legislation" to include appropriation requests. See *Environmental Defense Fund* v. *TVA*, 468 F. 2d 1164, 1181 (CA6 1972); *Scientists' Institute for Public Information, Inc.* v. *Atomic Energy Comm'n*, 156 U. S. App. D. C. 395, 404, 481 F. 2d 1079, 1088 (1973).

[16] These regulations become effective July 30, 1979. 43 Fed. Reg. 55978 (1978).

[17] The CEQ also noted that "[n]othing in the Council's determination, however, relieves agencies of responsibility to prepare statements when

CEQ's interpretation of NEPA is entitled to substantial deference. See *Warm Springs Dam Task Force* v. *Gribble,* 417 U. S. 1301, 1309–1310 (1974) (Douglas, J., in chambers). The Council was created by NEPA, and charged in that statute with the responsibility "to review and appraise the various programs and activities of the Federal Government in the light of the policy set forth in . . . this Act . . . , and to make recommendations to the President with respect thereto." 83 Stat. 855, 42 U. S. C. § 4344 (3).

It is true that in the past we have been somewhat less inclined to defer to "administrative guidelines" when they have "conflicted with earlier pronouncements of the agency." *General Electric Co.* v. *Gilbert,* 429 U. S. 125, 143 (1976). But CEQ's reversal of interpretation occurred during the detailed and comprehensive process, ordered by the President, of transforming advisory guidelines into mandatory regulations applicable to all federal agencies. See *American Trucking Assns.* v. *Atchison, T. & S. F. R. Co.,* 387 U. S. 397, 416 (1967). A mandatory requirement that every federal agency submit EIS's with its appropriation requests raises wholly different and more serious issues "of fair and prudent administration," *ibid.,* than does nonbinding advice. This is particularly true in light of the Court of Appeals' correct observation that "[a] rule requiring preparation of an EIS on the annual budget request for virtually every ongoing program would trivialize NEPA." 189 U. S. App. D. C., at 125, 581 F. 2d, at 903. The Court of Appeals accurately noted that such an interpretation of NEPA would be a *"reductio ad absurdum* . . . . It would be absurd to require an EIS on every decision on the management of federal land, such as fluctuation in the number of forest fire spotters." *Id.,* at 124, 581 F. 2d, at 902. Even respondents do not now contend that NEPA should be construed so

otherwise required on the underlying program or other actions." *Id.,* at 55989.

that all appropriation requests constitute "proposals for legislation." Brief for Respondents 13 n. 6, 55–61.

CEQ's interpretation of the phrase "proposals for legislation" is consistent with the traditional distinction which Congress has drawn between "legislation" and "appropriation." [18] The rules of both Houses "prohibit 'legislation'

---

[18] The Congressional Budget Act of 1974 directs the Comptroller General of the United States, "in cooperation with the Secretary of the Treasury, the Director of the Office of Management and Budget, and the Director of the Congressional Budget Office, [to] develop, establish, maintain, and publish standard terminology, definitions, classifications, and codes for Federal fiscal, budgetary, and program-related data and information." 88 Stat. 327, 31 U. S. C. § 1152 (a) (1). Pursuant to this statutory authority, the Comptroller General has published definitions distinguishing "authorizing legislation" from "appropriation." *Authorizing legislation* is defined in the following manner:

"Basic substantive legislation enacted by Congress which sets up or continues the legal operation of a Federal program or agency either indefinitely or for a specific period of time or sanctions a particular type of obligation or expenditure within a program. Such legislation is normally a prerequisite for subsequent appropriations or other kinds of budget authority to be contained in appropriations acts. It may limit the amount of budget authority to be provided subsequently or may authorize the appropriation of 'such sums as may be necessary.'" Comptroller General of the United States, Terms Used in the Budgetary Process 4 (1977).

*Appropriation,* on the other hand, is defined as:

"An authorization by an act of the Congress that permits Federal agencies to incur obligations and to make payments out of the Treasury for specified purposes. An appropriation usually follows enactment of authorizing legislation. . . . Appropriations do not represent cash actually set aside in the Treasury for purposes specified in the appropriation act; they represent limitations of amounts which agencies may obligate during the time period specified in the respective appropriations acts." *Id.,* at 3.

Congressional enactments employ this distinction between appropriation and legislation. For example, the Budget and Accounting Act requires the President to include in the proposed budget he submits to Congress

"with respect to each proposal in the Budget for new or additional *legislation* which would create or expand any function, activity, or authority, in

from being added to an appropriation bill." L. Fisher, Budget Concepts and Terminology: The Appropriations Phase, in 1 Studies in Taxation, Public Finance and Related Subjects—A Compendium 437 (Fund for Public Policy Research 1977). See Standing Rules of the United States Senate, Rule 16 (4) ("No amendment which proposes general legislation shall be received to any general appropriation bill . . ."); Rules of the House of Representatives, 96th Cong., 1st Sess.,

---

addition to those functions, activities, and authorities then existing or as then being administered and operated, a tabulation showing—

"(A) the amount proposed in the Budget for *appropriation* and for expenditure in the ensuing fiscal year on account of such proposal; and

"(B) the estimated *appropriation* required on account of such proposal in each of the four fiscal years, immediately following that ensuing fiscal year, during which such proposal is to be in effect . . . ." As added, 84 Stat. 1169, 31 U. S. C. § 11 (a) (12) (emphasis supplied).

See also 18 U. S. C. § 1913; 22 U. S. C. § 2394 (c).

The Executive Branch also recognizes the distinction between appropriation and legislation. For example, OMB distinguishes its function "[t]o supervise and control the administration of the budget" from its task of assisting "the President by clearing and coordinating departmental advice on proposed legislation." Requiring Confirmation of Future Appointments of the Director and Deputy Director of the Office of Management and Budget, H. R. Rep. No. 93–697, p. 18 (1973). See Neustadt, Presidency and Legislation: The Growth of Central Clearance, 48 Am. Pol. Sci. Rev. 641 (1954). OMB Circular No. A–19 (1972) establishes OMB's procedures for "legislative coordination and clearance," whereas OMB Circular No. A–11 (1978) sets out OMB's guidelines for the "Preparation and Submission of Budget Estimates." OMB Circular No. A–19, § 6 (a), requires each federal agency to "prepare and submit to OMB annually its proposed legislative program for the next session of Congress. These programs must be submitted at the same time as the initial submissions of an agency's annual budget request as required by OMB Circular A–11." OMB Circular A–11, § 13.2, on the other hand, provides:

"If, in addition to the regular appropriation requests, it appears probable that proposals for *new legislation* may require a further budget request or result in a change in revenues or outlays, a tentative forecast of the supplemental estimate will be set forth separately. . . . Such proposed supplementals must be consistent with items appearing in the agency's legislative program as required by OMB Circular No. A–19 . . . ."

Rule XXI (2) (1979);[19] 7 C. Cannon, Precedents of the House of Representatives §§ 1172, 1410, 1443, 1445, 1448, 1459, 1463, 1470, 1472 (1936). The distinction is maintained "to assure that program and financial matters are considered independently of one another. This division of labor is intended to enable the Appropriations Committees to concentrate on financial issues and to prevent them from trespassing on substantive legislation." House Budget Committee, Congressional Control of Expenditures 19 (Comm. Print 1977). House and Senate rules thus require a "previous choice of policy . . . before any item of appropriations might be included in a general appropriations bill." *United States ex rel. Chapman* v. *FPC*, 345 U. S. 153, 164 n. 5 (1953). Since appropriations therefore "have the limited and specific purpose of providing funds for authorized programs," *TVA* v. *Hill*, 437 U. S., at 190, and since the "action-forcing" provisions of NEPA are directed precisely at the processes of "planning and . . . decisionmaking," 42 U. S. C. § 4332 (2)(A), which are associated with underlying legislation, we conclude that the distinction made by CEQ's regulations is correct and that "proposals for legislation" do not include appropriation requests.

## B

The Court of Appeals' alternative interpretation of NEPA is that appropriation requests constitute "proposals for . . . major Federal actions."[20] But this interpretation distorts the

---

[19] L. Deschler, Procedure in the U. S. House of Representatives § 26–1.2 (1977) states that "[l]anguage in an appropriation bill changing existing law is legislation and not in order." Conversely, "[r]estrictions against the inclusion of appropriations in legislative bills are provided for by House rule . . . ." *Id.*, § 25–3.1.

[20] CEQ regulations define "major Federal action" in the following manner:

" 'Major Federal action' includes actions with effects that may be major and which are potentially subject to Federal control and responsibility. Major reinforces but does not have a meaning independent of significantly . . . . Actions include the circumstance where the responsible offi-

language of the Act, since appropriation requests do not "propose" federal actions at all; they instead fund actions already proposed. Section 102 (2) (C) is thus best interpreted as applying to those recommendations or reports that actually propose programmatic actions, rather than to those which merely suggest how such actions may be funded. Any other result would create unnecessary redundancy. For example, if the mere funding of otherwise unaltered agency programs were construed to constitute major federal actions significantly affecting the quality of the human environment, the resulting EIS's would merely recapitulate the EIS's that should have accompanied the initial proposals of the programs. And if an agency program were to be expanded or revised in a manner that constituted major federal action

---

cials fail to act and that failure to act is reviewable by courts or administrative tribunals under the Administrative Procedure Act or other applicable law as agency action.

."(a) Actions include new and continuing activities, including projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by federal agencies; new or revised agency rules, regulations, plans, policies, or procedures; and legislative proposals . . . .

"(b) Federal actions tend to fall within one of the following categories:

"(1) Adoption of official policy, such as rules, regulations, and interpretations adopted pursuant to the Administrative Procedure Act, 5 U. S. C. 551 et seq.; treaties and international conventions or agreements; formal documents establishing an agency's policies which will result in or substantially alter agency programs.

"(2) Adoption of formal plans, such as official documents prepared or approved by federal agencies which guide or prescribe alternative uses of federal resources, upon which future agency actions will be based.

"(3) Adoption of programs, such as a group of concerted actions to implement a specific policy or plan; systematic and connected agency decisions allocating agency resources to implement a specific statutory program or executive directive.

"(4) Approval of specific projects, such as construction or management activities located in a defined geographic area. Projects include actions approved by permit or other regulatory decision as well as federal and federally assisted activities." 43 Fed. Reg. 56004–56005 (1978) (to be codified at 40 CFR § 1508.18).

significantly affecting the quality of the human environment,[21] an EIS would have been required to accompany the underlying programmatic decision.[22] An additional EIS at the appropriation stage would add nothing.

Even if changes in agency programs occur *because* of budgetary decisions, an EIS at the appropriation stage would only be repetitive. For example, respondents allege in their complaint that OMB required the Fish and Wildlife Service to decrease its appropriation request for the NWRS, and that this decrease would alter the operation of the NWRS in a manner that would significantly affect the quality of the human environment. See n. 9, *supra*. But since the Fish and Wildlife Service could respond to OMB's budgetary curtailments in a variety of ways, see United States Fish and Wildlife Service, Final Environmental Statement: Operation of the National Wildlife Refuge System (Nov. 1976), it is impossible to predict whether or how any particular budget cut will in fact significantly affect the quality of the human environment. OMB's determination to cut the Service's budget is not a programmatic proposal, and therefore requiring OMB to include an EIS in its budgetary cuts would be premature. See *Aberdeen & Rockfish R. Co.* v. *SCRAP*, 422 U. S. 289, 320 (1975). And since an EIS must be prepared if any of the revisions the Fish and Wildlife Service proposes in its ongoing programs in response to OMB's budget cuts would significantly affect the quality of the human environment, requiring the Fish and Wildlife Service to include an EIS with its revised appropriation request would merely be redundant.

---

[21] "[M]ajor Federal actions" include the "expansion or revision of ongoing programs." S. Rep. No. 91–296, p. 20 (1969).

[22] For example, if an agency were to seek an appropriation to initiate a major new program that would significantly affect the quality of the human environment, or if it were to decline to ask for funding so as to terminate a program with a similar effect, the agency would have been required to include EIS's in the recommendations or reports on the proposed underlying programmatic decisions.

Moroever, this redundancy would have the deleterious effect of circumventing and eliminating the careful distinction Congress has maintained between appropriation and legislation. It would flood House and Senate Appropriations Committees with EIS's focused on the policy issues raised by underlying authorization legislation,[23] thereby dismantling the "division of labor" so deliberately created by congressional rules.

## C

We conclude therefore, for the reasons given above, that appropriation requests constitute neither "proposals for legis-

---

[23] The Court of Appeals held that EIS's need be included in appropriation requests for "major Federal actions" only if major changes that would significantly affect the quality of the human environment are proposed in the underlying programs for which funding is sought. See 189 U. S. App. D. C., at 125, 581 F. 2d, at 903. But an appropriation request applies not only to major changes in a federal program, but also to the entire program it is designed to fund. Without appropriations, the underlying program would cease to exist. Therefore, if the existence *vel non* of that program is a major federal action significantly affecting the quality of the human environment, the Court of Appeals' alternative interpretation of NEPA would require an EIS to be included in the concomitant appropriation request.

It is important to note that CEQ regulations provide that the adjective "major" in the phrase "major Federal actions" "reinforces but does not have a meaning independent of [the adverb] significantly" in the phrase "significantly affecting the quality of the human environment." 43 Fed. Reg. 56004 (1978) (to be codified at 40 CFR § 1508.18). See n. 20, *supra*. As a consequence, the Court of Appeals' holding that certain appropriation requests are "proposals for . . . major Federal actions" is operationally identical to its holding that certain appropriation requests constitute "proposals for legislation." Both holdings would require EIS's to accompany funding requests for every federal program that significantly affects the quality of the human environment. Thus, not only do both holdings run the same dangers of "trivializing" NEPA, but also the same "traditional concepts relating to appropriations and the budget cycle, considerations of timing and confidentiality," 43 Fed. Reg. 55989 (1978), which led CEQ to distinguish "appropriations" from "legislation," would require appropriations to be distinguished from "proposals for . . . major Federal actions."

lation" nor "proposals for . . . major Federal actions," and that therefore the procedural requirements of § 102 (2)(C) have no application to such requests.[24]   The judgment of the Court of Appeals is reversed.

*So ordered.*

---

[24] Because we conclude that § 102 (2)(C) has no application to appropriation requests, it is clear that the Court of Appeals was incorrect in requiring OMB "to adopt procedures and appropriate regulations to comply with the obligations NEPA imposes on the budget process . . . ."   189 U. S. App. D. C., at 127, 581 F. 2d, at 905.   See n. 14, *supra*.