The STATE of North Dakota, Allen I. Olson, Attorney General of North Dakota, Plaintiff,

and

National Rural Electric Cooperative Association (NRECA), Plaintiff in Intervention,

v.

Cecil ANDRUS, Secretary of the Interior, Charles Warren, Chairman, Council on Environmental Quality and James T. McIntyre, Acting Director, Office of Management and Budget, Defendants.

No. A77–1063.

United States District Court, D. North Dakota, Southwestern Division.

Jan. 25, 1980.

Allen I. Olson, Atty. Gen. of North Dakota, Murray G. Sagsveen, Special Asst. Atty. Gen., Bismarck, N. D., for plaintiff; Frederick L. Miller, Jr., Special Asst. Atty. Gen., Washington, D. C., of counsel.

James R. Britton, U. S. Atty., Fargo, N. D., Andrew J. Walch, Land and Natural Resource Div., Dept. of Justice, Washington, D. C., for defendants.

MEMORANDUM AND ORDER

VAN SICKLE, District Judge.

The issue presented on Plaintiff's motion and Defendants' cross motion for partial summary judgment arises from a proposal submitted to Congress by the Department of Interior involving the future financing of federal water projects. The question is whether the terms of the National Environ-

mental Policy Act of 1969 (NEPA), 42 U.S.C. § 4321 et seq., require that an environmental impact statement (EIS) be prepared and submitted by defendant Andrus in conjunction with that proposal. Jurisdiction is founded on 28 U.S.C. § 1331 (federal question).

On June 6, 1978, President Carter sent a message to Congress announcing his proposals with regard to federal water policy. In that message the President indicated that, inter alia, he would be directing the preparation of a legislative proposal for modification of state and federal cost-sharing for water projects. The President then issued a directive to Secretary Andrus, Chairman of the Water Resources Council on July 12, entitled "Enhanced Federal-State Cooperation in Water Management." [1]

On May 16, 1979, pursuant to the Presidential directive, Secretary Andrus transmitted cost-sharing legislation to Congress which is cited as "The Federal Water Projects Financing Act of 1979." This proposed legislation would require the increased involvement and responsibility of

the States in federal water project decisions and financing. The bill would require that for projects of the Army Corps of Engineers, the Bureau of Reclamation, and the Tennessee Valley Authority, the States within whose boundaries projects are located, must contribute to the implementation costs of the project the following amounts:

1. 10% of all implementation costs associated with vendible outputs of the projects (e. g., agricultural water, municipal and industrial water and hydroelectric power) and

2. 5% of all implementation costs associated with nonvendible outputs. Nonvendible outputs include such project benefits as navigation, recreation, and other benefits commonly marketed by the Federal Government.

Where projects are located in more than one State, the 10% and 5% shares would be apportioned among the States, but the total would not exceed those percentages. These States would also be free to solicit financial assistance from States which benefit from

1. The President's directive provided in pertinent part:

". . . I have decided . . . to seek direct financial assistance from the States to share in the costs of Federal water projects. The decision I have made with respect to the sharing of the costs of Federal water projects will accomplish, among other things, two goals I consider to be extremely important: (1) involving the States more heavily in water project decisions; and (2) eliminating some of the conflicting rules governing cost-sharing—especially with regard to structural and nonstructural flood damage reduction measures.

In order to carry out this decision, you are hereby directed to prepare with respect to the programs of the Bureau of Reclamation, Corps of Engineers, and TVA, whatever rules, procedures, guidelines or legislation are necessary to accomplish the following four projects not yet authorized by law:

Require that States provide a legally binding commitment to contribute a 10% cash share of the construction costs associated with vendible outputs of water projects within their borders plus 5% of the cost of other project purposes (in-kind contributions not allowed). (Vendible outputs are defined as those water supply, irrigation, power, and recreation benefits of projects for which the Federal government receives revenues from project beneficiaries under present policies.) The

State's cash contribution is to be paid concurrently and proportionately with the Federal contractual obligation for project construction and is in addition to any contribution now required of project sponsors or beneficiaries;

—Provide for the sharing of revenues from vendible outputs between the Federal government and the States in proportion to their respective investments;

—Include an annual project-by-project "cap" on State contributions of ¼ of 1% of a State's general revenues; and

—Provide that for multistate projects, the total States' share will be computed by determining contributions from benefiting States; a State refusing to participate could thus not "veto" a project because other States could make up the difference.

You are further directed to prepare whatever legislation is necessary to modify existing cost-sharing rules so as to require, in addition to the cost-sharing requirements covered above, a standard 20% nonfederal contribution for structural and nonstructural Federal flood damage reduction measures. This requirement would apply to all Federal agencies which provide flood protection benefits as project purposes. The 20% contribution may include any combination of cash and in-kind contributions (e. g., land, easements, rights-of-way)."

the project, but in which the project is not physically located.

Net operating revenues from the vendible outputs of each project would be shared with each participating State in proportion to each State's share of the financing of the vendible outputs of the project.

The legislation would also require the same agencies and the Soil Conservation Service to obtain from participating non-federal entities on each project with flood control benefits a payment of 20% of structural or nonstructural project implementation costs that are allocated to flood damage reduction purposes. This requirement would supersede all other cost sharing requirements for flood control projects and would provide consistency among such projects for cost sharing purposes.

Payments would be required within six months after the fiscal year in which funds are obligated, or in the case of flood control cost sharing, payments would be required prior to project construction, or in ten annual installments beginning with commencement of construction. Payments of the flood control cost share could be made in kind. In order to protect those States with low general revenues, the bill provides that a State's annual financing share shall not exceed ¼ of 1% of its general revenues in the year preceding the required contribution. The Act would apply to all projects authorized after enactment.

In conjunction with the submission of this legislative proposal an environmental assessment was prepared, and based thereon, determination was made by the Department of the Interior that no EIS would be required to accompany the legislative proposal.[2]

NEPA is an environmental full-disclosure law that is additionally intended to effectuate substantive changes in the decision making process of federal agencies. *M.P.I. R.G. v. Butz,* 498 F.2d 1314 (8th Cir. En Banc 1974); *Environmental Defense Fund v. Corps of Engineers,* 470 F.2d 289 (8th Cir. 1972). The key, action-forcing provision of NEPA is § 102(2)(C), 42 U.S.C. § 4332(2)(C). That section requires an EIS to be included in recommendations or reports on both:

"proposals for legislation . . . significantly affecting the quality of the human environment" and

"proposals for . . . major Federal actions significantly affecting the quality of the human environment."

The threshold determination of whether a legislative proposal significantly affects the quality of the human environment is reserved to the federal agency. If the agency determines that the proposed legislation does not significantly affect the quality of the human environment, no detailed evaluation and consideration of the environmental impacts of the proposed legislation is necessary. In this action, defendant Andrus as Secretary of the Interior has determined that the proposed legislation does not have a significant affect on the quality of the human environment. It is this Court's duty to review that determination.

The standard of review was set forth by Chief Judge Gibson in *M.P.I.R.G. v. Butz,* supra, as follows:

"Section 102(1) of the Act (NEPA) contains a Congressional direction that environmental factors can be considered 'to

---

**2.** This procedure is outlined in the Federal Regulations:

The Guidelines issued by the Council on Environmental Quality were originally published pursuant to Executive Order 11514 (1970) to implement the procedural provisions of NEPA, 40 C.F.R. § 1500.6 (1973).

Because of inconsistencies that developed over the weight to be accorded the Guidelines, the President issued Executive Order 11991 on May 24, 1977, directing the Council to issue regulations. In accordance with this directive, the Council's regulations are now binding on all Federal agencies. The regulations also establish formal guidance from the Council on the requirements of NEPA for use by the courts in interpreting that law.

The regulations which now dictate the preparation of an Environmental Assessment and a subsequent determination by the Federal agency of whether to proceed with the preparation of an EIS are found at 40 C.F.R. §§ 1501.3, 1501.4 (1979). A more complete discussion of the progression from CEQ Guidelines to CEQ Regulations can be found at 43 Fed.Reg. 55978, et seq. (1978).

the fullest extent possible.' An initial decision not to prepare an EIS precludes the full consideration directed by Congress. In view of the concern for environmental disclosure present in NEPA, the agency's discretion as to whether an impact statement is required is properly exercised only within narrow bounds. Action which could have a significant effect on the environment should be covered by an impact statement. We think that the threshold decision as to whether or not to prepare an EIS should be reviewed not on the arbitrary and capricious standard used to test a substantive decision which entails a balancing and weighing of alternatives already studied, but on the grounds of its reasonableness.

\* \* \* \* \* \*

. . . We therefore hold that review of an agency's determination not to prepare an impact statement should be measured by its reasonableness in the circumstances, not as to whether it was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

*M.P.I.R.G. v. Butz,* supra at 1320.

A review of the Environmental Assessment reveals the following conclusion with regard to the environmental impacts of the proposed legislation.

"It is apparent that the President's objective for this cost-sharing legislation is to involve the States directly and more positively in all the choices and decisions regarding project development and management. The impact is financial and political in nature. The environmental impact is not changed and the environmental protections are actually strengthened by other parts of the President's policy.

Because all projects must meet NEPA requirements, the Water Resources Council's "Principles and Standards" planning and evaluation tests, and must comply with the environmental statutes now in effect before a project is authorized or funded; and because the proposed legislation does not change or affect these procedures and requirements, the physical effects of the prospective projects will not be different from the effects that occur now. The proposed legislation will apply to projects authorized after the date of enactment and, therefore, it is only speculative as to their number, locale, size or mix of purposes."

(United States Department of Interior "Environmental Assessment of the Impact of Proposed Legislation. The Federal Water Projects Financing, Cost, and Revenue Sharing Act." As transmitted by letter of May 14, 1979, signed by Assistant Secretary for Land and Water Resources.)

Defendants assert that because the impact of this proposal is political and financial (i. e. where will the money come from to finance the project?) there is no affect on the "human environment" as defined by CEQ regulations [3] and therefore, no EIS is required. Further, any proposals on future projects financed under this legislation would require an EIS if they were found to be major projects significantly affecting the quality of the human environment.

Plaintiff asserts that although the legislation is primarily political and financial in nature, it will have a tremendous environmental impact upon the western states in that an indirect effect of this legislation would be to discourage environmentally sound projects. The thrust of Plaintiff's position is that by requiring the States to assume a fixed share of the cost as a prerequisite to the construction of any future water projects, the federal government will force the States to place economic considerations ahead of environmental concerns. The logic is that there exists an inverse relationship between economically feasible

---

**3.** " 'Human Environment' shall be interpreted comprehensively to include the natural and physical environment and the relationship of people with that environment. This means that economic or social effects are not intended by themselves to require preparation of an environmental impact statement." 40 C.F.R. § 1508.14 (1979).

water projects and those which are environmentally sound.[4]

The Supreme Court decision in *Andrus v. Sierra-Club*, 442 U.S. 347, 99 S.Ct. 2335, 60 L.Ed.2d 943 (1979), offers some guidance in the instant situation. In an unanimous decision, the court held that appropriation requests are not "proposals for legislation" within the meaning of § 102(2)(C) of NEPA. In so holding the Court pointed out the traditional distinction which Congress has drawn between "legislation" and "appropriation," the rules of both Houses prohibiting "legislation" from being added to an appropriation bill. In finding further that appropriation requests do not constitute "proposals for . . . major Federal actions" for purposes of § 102(2)(C), the court explained:

> Section 102(2)(C) is thus best interpreted as applying to those recommendations or reports that actually propose programmatic actions, rather than to those which merely suggest how such actions may be funded."

*Andrus v. Sierra-Club,* supra, at 362, 99 S.Ct. at 2343.

Applying that holding to the facts of that case, the court stated:

> Even if changes in agency programs occur *because* of budgetary decisions, an EIS at the appropriation stage would only be repetitive. For example, respondents allege in their complaint that OMB

required the Fish and Wildlife Service to decrease its appropriation request for NWRS, and that this decrease would alter the operation of the NWRS in a manner that would significantly affect the quality of the human environment. . . . But since the Fish and Wildlife Service could respond to OMB's budgetary curtailments in a variety of ways, . . . ., it is impossible to predict whether or how any particular budget cut will in fact significantly affect the quality of the human environment. . . . And since an EIS must be prepared if any of the revisions the Fish and Wildlife Service proposes in its ongoing programs in response to OMB's budget cuts would significantly affect the quality of the human environment, requiring the Fish and Wildlife Service to include an EIS with its revised appropriation request would merely be redundant." (Emphasis in original.)

*Id.*

In avoiding this duplicity, and thereby minimizing the danger of "trivializing" NEPA, the court recognized that nothing in its opinion would relieve the agency of its responsibility to prepare statements when otherwise required on the underlying program or other action.

This court recognizes that the proposal now under consideration is "legislation" as opposed to "appropriation" [5] so that the *An-*

---

4. The Court is cognizant of the fact that this proposal will have the affect of inhibiting federal involvement in development of the semi-arid western states where the skin of the earth is most delicate and water means everything. The 20% flood control contribution is particularly crippling to flood control programs, a serious matter where, as in North Dakota, weather extremes and access to water make the flood plains most desirable for urban development. For example, abandonment of flood plain control would devastate the four principle cities of North Dakota. The Court is also keenly aware of the emotionalism attached to this proposal because it is viewed in the western states as President Carter's way of "getting back" at this region of the country for its failure to support him in the 1976 presidential election. None of these observations, however, change the fact that the State of North Dakota has failed to show any foreseeable environmental effects on

any specific water project, thus pointing up the speculative nature of any EIS that would be compiled.

5. "Legislation" is defined by the CEQ as including:

> ". . . a bill or legislative proposal to Congress developed by or with the significant cooperation and support of a Federal agency, but does not include requests for appropriations. The test for significant cooperation is whether the proposal is in fact predominantly that of the agency rather than another source." 40 C.F.R. 1508.17 (1979).

The record makes clear that although the directive itself was sent from the President to Secretary Andrus, the "leg work" was that of the Department of the Interior, and therefore the "significant cooperation" test is satisfied and the proposal under consideration is a legislative proposal.

*drus* holding does not automatically dispose of the issue. However, the underlying logic of that decision provides a useful guide.

Plaintiff has failed to point up the affect the cost-sharing proposal would have on any ongoing or currently authorized water projects. The reason Plaintiff has failed is that, by its terms, the cost-sharing proposal is applicable only to projects authorized "after the date of enactment of this Act." The situation presented is the same as was present in the *Andrus* decision; since the States could respond to the cost-sharing legislation in a variety of ways, it is impossible to predict whether or how this legislation will in fact significantly affect the quality of the human environment. It is important to note the difference between this finding and the finding that the preparation of an EIS would cause administrative difficulty, delay or economic cost. See *Calvert Cliff's Coord. Com. v. U. S. Atomic Energy Comm.*, 146 U.S.App.D.C. 33, 449 F.2d 1109 (D.C.Cir.1971). In the latter set of circumstances the argument against the preparation of an EIS is based upon the long and arduous task required to complete the statement, an argument which has met with no success because of the requirement in NEPA that its procedural duties be complied with "to the fullest extent possible." 42 U.S.C. § 4332. The situation in this case crosses the line from difficulty to impossibility. Not only would requiring an EIS at this stage be repetitive, it would also result in large scale speculation. It can hardly be said that an EIS based largely upon speculation would further the policy of NEPA to insure that the ultimate decision maker has before him a complete evaluation of the potential environmental impact of a proposed action before making his decision.

Here, as in *Andrus*, nothing in this decision will in any way affect the requirement that an EIS be prepared when a specific project is proposed under the terms of the cost-sharing legislation, should it meet the requirement of significantly affecting the quality of the human environment.

Although it concedes that the primary thrust of the cost-sharing legislation is political and financial in nature, Plaintiff asserts that the indirect effects must also be considered in determining whether a particular proposal significantly affects the quality of the human environment.

■ There is no doubt that NEPA is concerned with indirect effects as well as direct effects. *M.P.I.R.G. v. Butz, supra* at 1322. However, the indirect effects which are caused by the action and are later in time or farther removed in distance must still be "reasonably foreseeable." 40 C.F.R. § 1508.8 (1979). This court agrees that "reasonable" forecasting and speculation are implicit in NEPA, *S. I. P. I. v. Atomic Energy Com'n*, 156 U.S.App.D.C. 395, 408, 481 F.2d 1079, 1092 (D.C.Cir.1973), but in attempting to forecast the indirect effects of this particular proposal one must go beyond reasonable forecasting, and enter the realm of pure speculation.

Further, the significant affect must be on the quality of the "human environment." "Human environment" has been interpreted by the CEQ to include the natural and physical environment and the relationship of people with that environment,

"This means that economic or social effects are not intended by themselves to require preparation of an environmental impact statement."

40 C.F.R. § 1508.14 (1979).

For all of these reasons I find that within the meaning of 42 U.S.C. § 4321 et seq., the proposed legislation imposes no reasonably foreseeable significant affect upon the quality of the human environment.

■ Plaintiff has, however, raised an additional basis for its assertion that an EIS must be prepared to accompany the cost-sharing proposal. The contention is that the cost-sharing legislation is "highly controversial" and pursuant to former CEQ guidelines and current Department of the Interior procedural rules an EIS is required for proposed controversial major federal actions. The expression "controversial" relates to situations where a substantial dispute exists as to the environmental effects of the proposed action and not merely to

opposition to the intended use of the project. *Tex. Committee on Natural Resources v. Bergland*, 433 F.Supp. 1235 (E.D. Tex.1977); *Rucker v. Willis*, 484 F.2d 158 (4th Cir. 1973). No such dispute exists here. Plaintiff's position that there will be an indirect affect on the human environment is not flatly disputed by Defendants. Defendants merely assert, and this Court agrees, that any such affect is purely speculative at this stage.

I find that Defendant Secretary of the Interior's determination that an EIS was not required to accompany this cost-sharing legislative proposal was reasonable.

Now, therefore, the Court having considered the pending motion and cross-motion in the framework of Rule 56 Fed.R. Civ.P., together with briefs, affidavits and all other file documents pertinent thereto,

IT IS ORDERED that Plaintiff's motion for partial summary judgment is *denied*, and

IT IS FURTHER ORDERED that the Defendants' cross-motion for partial summary judgment is *granted.*