Harold **THOMAS**, dba Allison Ranch and Cook Ranch, et al, Jim Campbell, Ed Robertson, Jr., D.J. Grim, George Waldenmeyer, Bob Tillotson, Don Holland, Dr. Howard Adkins, E.I. Robertson, Orville Groves, Jack Badley, Paul Resnick, Virginia Hopfenbeck, E.C. Tom Close, Francis Wisner, Jim Powell, Richard Justis, Dixie Outfitters, Ralph Gormley, Lester West, Idaho Conservation League, Idaho Wildlife Federation, Idaho Environmental Council, Ada County Fish and Game League Western Whitewater Assoc., Inc. Dan Cada, Ernest E. Day, Robert L. Day, T. Stanley Nelson, Janet Ward, Fredrick Ward, Herbert Erickson, Ronald B. Jones, Morton R. Brigham, Ed Langworthy, Marjorie Hayes, John Zimmer, Jr., Plaintiffs,

v.

R. Max **PETERSON**, in his official capacity as Chief of the United States Forest Service, Defendant.

Inland Forest Resources Council, a Montana Corporation; Bennett Lumber Products Company, an Idaho corporation; and Evergreen Forest Products, an Idaho corporation, Defendants/Intervenors.

Civ. No. 82–2056.

United States District Court, D. Idaho.

May 21, 1984.

Michael Axline, Pacific Northwest Resources Clinic, Eugene, Or., Bruce Bowler, Boise, Idaho, for plaintiffs.

William R. Van Hole, U.S. Atty., Jeffery W. Ring, Asst. U.S. Atty., Boise, Idaho, for defendant.

Runft, Stecher, Coffin, Adlard & O'Riordan, Boise, Idaho, for defendants/intervenors.

## MEMORANDUM DECISION

CALLISTER, Chief Judge.

In this action, plaintiffs contend that the United States Forest Service decided to build a forest road without complying with certain statutory and regulatory procedures. Specifically, plaintiffs assert that the Forest Service violated various provisions of the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.;* the National Forest Management Act, 16 U.S.C. § 1600 *et seq.;* the Endangered Species Act, 16 U.S.C. § 1531 *et seq.;* the National Forest Roads and Trails Systems Act, 16 U.S.C. § 535 *et seq.;* the Wild and Scenic Rivers Act, 16 U.S.C. § 1271 *et seq.;* the Administrative Procedures Act, 5 U.S.C. § 551 *et seq.;* and the regulations promulgated under each of these acts. Plaintiffs seek to enjoin the building of the road and a declaratory judgment finding the alleged violations of these acts.

This Court permitted Evergreen Forest Products, Bennett Lumber Company, and the Inland Forest Resources Council to intervene in the action as defendants. These intervenors, the plaintiffs, and the federal defendant have all moved for summary judgment. The parties are in general agreement that there are no genuine issues as to any material fact, and the Court

likewise finds that none exists. Accordingly, summary judgment is appropriate at this juncture. *See* Fed.R.Civ.P. 56(c).

## I. FACTUAL BACKGROUND

On February 9, 1981, the Forest Service issued a decision notice proposing construction of the "Jersey Jack Road." Prior to the issuance of that decision notice, eight alternative proposals were considered and "Alternative No. 4" was selected. That alternative proposes constructing approximately 14.2 miles of new road and reconstructing 1.18 miles of existing road between Dixie Summit and Lowman Saddle in the Nezperce National Forest.

The proposed road is a single-lane, gravel road located approximately fifty-miles southeast of Grangeville, Idaho, in the Red River Ranger District of the Nezperce National Forest. Before 1968, the area proximate to the proposed road was within the Dixie Ranger District.

In connection with the decision to build the proposed road, the Forest Service conducted an environmental assessment from which the Nezperce Forest Supervisor determined that a full environmental impact statement was unnecessary. Consequently, a "finding of no significant impact" was issued with the decision notice.

Following an appeal of the decision notice by one of the plaintiffs named in this action, the Regional Forester rendered a decision affirming the Forest Supervisor's actions. The Regional Forester's decision was then appealed to the Chief of the Forest Service, and on November 24, 1981, the Chief affirmed the Regional Forester's decision. Pursuant to 36 C.F.R. § 211.-19(i)(2), the Chief's decision became the final administrative determination by the United States Department of Agriculture.

## II. NATIONAL ENVIRONMENTAL POLICY ACT

Plaintiffs' complaint alleges that the Forest Service violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.* by relying upon an Environmental Assessment (EA) rather than preparing an Environmental Impact Statement (EIS) for the proposed Jersey Jack Road. According to defendant and the intervenors, a full EIS was unnecessary because the EA indicates little impact on the environment would result from constructing the road.

Title 42 U.S.C. § 4332(2)(C) describes the circumstances requiring preparation of an EIS [1] and charges the Council on Environmental Quality (CEQ) with implementing the goals of NEPA through necessary regulations. *See* 40 C.F.R. §§ 1500–08; *Andrus v. Sierra Club*, 442 U.S. 347, 358, 99 S.Ct. 2335, 2341, 60 L.Ed.2d 943 (1979). Under NEPA, all federal agencies must

include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

42 U.S.C. § 4332(C).

The CEQ regulations establish three categories of federal agency activities. The first category consists of actions which clearly will have no significant environmen-

---

**1.** An "environmental impact statement" is a detailed written statement comporting with the requirements of 42 U.S.C. § 4332(2)(C). 40 C.F.R. § 1508.11. Although the format for each particular EIS is left to the discretion of the preparing agency, various regulations prescribe a recommended format. *See* 40 C.F.R. §§ 1502.7–1502.25.

tal impact and therefore may be categorically excluded. *See* 40 C.F.R. §§ 1501.-4(a)(2), 1508.4.

In the second category are those actions where the agency is uncertain about the significance of the impact. For these actions, agencies must prepare an Environmental Assessment (EA). 40 C.F.R. § 1504.4(2)(B). An EA is a "concise public document" that should "[b]riefly provide significant evidence and analysis for determining whether to prepare an environmental impact statement or a finding of significant impact." 40 C.F.R. § 1508.9. The purpose of an EA is to determine whether an EIS is required, to facilitate preparation of the EIS if necessary, and to aid the agency in complying with NEPA if no EIS is required. *See* 40 C.F.R. § 1508.9; 7 C.F.R. § 3100.20.

If the EA demonstrates the impact to be significant, an EIS must be prepared. 40 C.F.R. § 1501.4(2)(C). When the impact is found to be insignificant, the agency makes a "finding of no significant impact" ("FONSI") 40 C.F.R. § 1501.4(2)(E); § 1508.13.

Here, the Forest Service entered a FONSI after completing an EA, thereby finding that an EIS was unnecessary. It is that determination which the Court must review under plaintiffs' NEPA claims.

The third category consists of all federal actions determined to have a significant impact on the environment. Such a determination may occur either in the initial stages of a proposed project, 40 C.F.R. § 1508.4, or as the result of preparing an EA. 40 C.F.R. § 1501.4(c). For these actions, an EIS must be prepared. 40 C.F.R. § 1508.11.

■ It is important to focus upon the appropriate standard of review of an agency's decision that an EIS is not required. Although some courts hold that that standard is whether the decision not to prepare the EIS was arbitrary and capricious, that standard typically applied in a review of administrative proceedings, *see e.g., Robinson v. Knebel,* 550 F.2d 422, 423, 427 (8th

Cir.1977); *Hanly v. Kleindienst,* 471 F.2d 823 (2d Cir.) *cert. denied* 412 U.S. 908, 93 S.Ct. 2290, 36 L.Ed.2d 974 (1972), the Ninth Circuit adheres to the more searching standard of "reasonableness." *Foundation for North American Wild Sheep v. Dept. of Agriculture,* 681 F.2d 1172, 1177 (9th Cir.1982); *City of Davis v. Coleman,* 521 F.2d 661, 673 (9th Cir.1975). An agency's determination that an EIS need not be prepared will be upheld unless unreasonable. *Foundation for North American Wild Sheep,* 681 F.2d at 1170; *Preservation Coalition, Inc. v. Pierce,* 667 F.2d 851, 859 (9th Cir.1982); *City and County of San Francisco v. United States,* 615 F.2d 498, 500 (9th Cir.1980).

■ On review, this Court must determine if the plaintiffs have "alleged facts which, if true, show that the proposed project *may* significantly degrade some human environmental factor." *Columbia Basin Land Protection Association v. Schlesinger,* 643 F.2d 585, 597 (9th Cir. 1981). Plaintiffs need not establish that significant effects on the human environment will actually occur. *Foundation for North American Wild Sheep,* 681 F.2d at 1178; *City and County of San Francisco,* 615 F.2d at 500. "If substantial questions are raised whether a project may have a significant effect upon the human environment, an EIS *must* be prepared." *Foundation for North American Wild Sheep,* 681 F.2d at 1178.

NEPA requires preparation of an EIS for all "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). Although the statute requires an EIS whenever there exists a "major federal action," few decisions address that provision in detail. Most attention is paid to the mandate that an EIS is necessary for federal actions "significantly affecting the quality of the human environment."

■ The federal courts have struggled to find an adequate definition of the phrase

"significantly affecting."[2] Whatever meaning is to be given the term, it must always be viewed in light of the NEPA goal of ensuring that federal agencies have before them a complete analysis of the project's environmental impact. *See City of Davis v. Coleman,* 521 F.2d 661, 673–76 (9th Cir.1975). Although the phrase is to be broadly construed,[3] the purpose of the statute is not to elevate environmental concerns over other relevant factors in decisionmaking. *See Strycker's Bay Neighborhood Council, Inc. v. Karlen,* 444 U.S. 223, 100 S.Ct. 497, 62 L.Ed.2d 433 (1980).

Plaintiffs launch a two-pronged attack in arguing that the decision to build the Jersey Jack Road violated NEPA. First, plaintiffs assert that construction of the road will significantly affect the quality of the human environment. Here, plaintiffs argue that the Forest Service omitted pertinent factors from the EA, and that the EA understates the significance of several factors. Plaintiffs further urge the Court to hold that the Forest Service has improperly limited the scope of the EA by not analyzing the effects of all future timber harvests in the area. Briefly stated, plaintiffs urge the Court to hold that the Forest Service should have concluded that an EIS was necessary under NEPA to fully examine the environmental effects of the proposed road.

■ The Court is satisfied that the Forest Service took the requisite "hard look" at the environmental consequences of building the road, and having done so, this Court will not attempt to second-guess the wisdom of the selected alternative. No doubt the EA could have been more com-

---

2. The regulations analyze the term "significantly" as follows:

§ 1508.17 *Significantly.*

"Significantly" as used in NEPA requires considerations of both context and intensity:

(a) *Context.* This means that the significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interest, and the locality. Significance varies with the setting of the proposed action. For instance, in the case of a site-specific action, significance would usually depend upon the effects in the locale rather than in the world as a whole. Both short- and long-term effects are relevant.

(b) *Intensity.* This refers to the severity of impact. Responsible officials must bear in mind that more than one agency may make decisions about partial aspects of a major action. The following should be considered in evaluating intensity:

(1) Impacts that may be both beneficial and adverse. A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial.

(2) The degree to which the proposed action affects public health or safety.

(3) Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.

(4) The degree to which the effects on the quality of the human environment are likely to be highly controversial.

(5) The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.

(6) The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration.

(7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts.

(8) The degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources.

(9) The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973.

(10) Whether the action threatens a violation of Federal, State or local law or requirements imposed for the protection of the environment.

3. The statutory phrase "actions significantly affecting the quality of the environment" is intentionally broad, reflecting the Act's attempt to promote an across-the-board adjustment in Federal agency decisionmaking so as to make the quality of the environment a concern of every Federal agency. *Scientists Institute for Public Information, Inc. v. Atomic Energy Commission,* 481 F.2d 1079, 1088 (D.C.Cir.1973).

prehensive, but it appears from the record that the Forest Service reasonably gathered and analyzed data relating to the effects of road construction in that portion of the Nezperce National Forest, and from that data reasonably concluded that the road would not significantly affect the quality of the human environment.

A few of plaintiffs' alleged deficiencies in the EA deserve attention. It is true that the EA did not address a quarry and short haul road necessary to supply rock for the Jersey Jack Road. The Court is satisfied that these factors were not a necessary part of the Jersey Jack Road EA because the quarry was located outside the assessment area, and further, an available rock source had not been identified when the Jersey Jack Road EA was prepared. The impact from the quarry operation and haul road were addressed separately and an EA prepared for the Rhett Creek Area.

■ The Court fails to see how the alleged "controversial" nature of the effects on the environment mandates preparing a full EIS in this instance. The primary dispute of the "size, nature, or effect" of the proposal, *Foundation for North American Wild Sheep v. Dept. of Agriculture,* 681 F.2d 1172, 1182 (9th Cir.1982); *see* 40 C.F.R. § 1508.27(b)(4), is plaintiffs' concern over the scope of the EA, and whether the Forest Service in fact has "proposed" an area-wide timber harvest program by its decision to construct the road. The Court treats and rejects this argument below, and accordingly finds that no substantial controversy over the road's environmental effects exists. Although there may be some controversy surrounding the road's effects on the quality of the environment, that controversy alone does not automatically mandate preparation of an EIS. *See Nucleus of Chicago Home Owners v. Lynn,* 524 F.2d 225, 231–32 (7th Cir.1975); *Hanly v. Kleindienst,* 471 F.2d 823, 830 (2d Cir. 1972) *cert. denied* 412 U.S. 908, 93 S.Ct. 2290, 36 L.Ed.2d 974 (1973); *Rucker v. Willis,* 484 F.2d 158, 162 (4th Cir.1973).

According to plaintiffs, the EA, on its face, demonstrates significant environmental impact from increased sedimentation and lost elk habitat. The Court is of the opinion, however, that the EA's treatment of these factors was reasonable, and plaintiffs have failed to demonstrate that the FONSI issued after consideration of the sedimentation and loss of elk habitat was unreasonable. The Court finds nothing in the record requiring it to disturb the agency's finding that these impacts were not significant. Likewise, the Court finds the Forest Service to have adequately considered the road's affect on local guides and outfitters' commercial activities.

In conclusion, the EA sufficiently raised and subjected to public comment the pertinent environmental effects of road construction necessary to evaluate the Jersey Jack Road proposal. Accordingly, the Court finds that the Forest Service's reliance upon the EA reasonable in light of the circumstances and available knowledge at the time the decision to build the road was rendered.

As their second prong of attack on the EA, plaintiffs argue that the Forest Service unreasonably limited the EA's scope. Plaintiffs take the position that the Forest Service action contemplated when the road was made is much broader than a mere decision to construct a forest road.

The Court notes that this decision to construct a road was not the first mention of harvesting timber in that area. Congress has found this particular region to be suitable for multiple use and timber harvesting. *See* Central Idaho Wilderness Act, Pub.L. No. 96–312, § 2, 94 Stat. 948 (1980). Further, an EIS accompanied the 1974 Combined Timber Management Plan and Road Program which discussed possible logging activities in the Nezperce National Forest. *See* Affidavit of Ed Laven. A Forest Integrated Management Plan and accompanying EIS are presently being prepared by the Nezperce National Forest, and future timber harvest activities will invariably be incorporated in that planning process and analysis.

To support their conclusion that area-wide timber harvest is proposed by the decision to build the road, plaintiffs point to

computation appearing on Page 17 of the EA:

> An issue of primary importance is the conflict of recreational, residential, and logging truck traffic. A simple calculation of the expected volume of logging truck traffic will illustrate this point.

$$\text{Number of Log Truck trips} = \frac{80{,}000 \text{ MBF}}{5 \text{ MBF/LOAD}} \times \frac{2 \text{ trips}}{\text{Load}} = 32{,}000 \text{ trips}$$

There will also be a substantial amount of logging associated traffic from equipment move in, move out, and personnel traffic. A maximum amount of conflict of traffic would be certain for alternatives 2, 3, 6, and 7. A moderate amount of conflict of traffic would be probable for alternative 5. A minimal conflict of traffic would be probable for alternatives 4 and 8.

From the figures appearing in this calculation, plaintiffs conclude that the "proposal" before the Forest Service when the EA was prepared was the future logging of the entire area rather than construction of one road. Plaintiffs find these facts analogous to those in *California v. Block*, 690 F.2d 753 (9th Cir.1982). In *California v. Block*, the Forest Service had adopted a system of wilderness classification proposing that various lands be categorized as non-wilderness. The court there found that, due to the regulatory scheme under which the Forest Service was operating and categorizing the lands, the agency had proposed to make an irreversible and irretrievable commitment of resources. *Id.* at 762–64; *see also Environmental Defense Fund, Inc. v. Andrus*, 596 F.2d 848, 852 (9th Cir.1979).

Under NEPA, agencies are directed to examine in a single EIS all "connected actions" or "cumulative actions".[4] Plaintiffs argue that the proposal to build the road is but one segment or interdependent part of an existing Forest Service proposal to harvest timber in the Jersey Jack area. The Forest Service has taken the position that only the road-building is "proposed" at this time and that each future timber sale will be accompanied by a separate EA, or where necessary, an EIS.

The regulations advance the following guide for determining when a contemplated project becomes a "proposal."

> "Proposal" exists at that stage in the development of an action when an agency subject to the Act has a goal and is actively preparing to make a decision on one or more alternative means of accomplishing that goal and the effects can be meaningfully evaluated. Preparation of an environmental impact statement on a proposal should be timed (§ 1502.5) so that the final statement may be completed in time for the statement to be included in any recommendation or report on the proposal. A proposal may exist in fact as well as by agency declaration that one exists.

40 C.F.R. § 1508.23.

■ The Court is unable to find that the decision to build the road in question is anything more than a decision to build a forest road. It is true that the EA does

---

4. "Connected actions" are those which "are closely related and therefore should be discussed in the same impact statement." 40 C.F.R. § 1508.25(a)(1).

Connected actions, which means that they are closely related and therefore should be discussed in the same impact statement. Actions are connected if they:

(i) Automatically trigger other actions which may require environmental impact statements.

(ii) Cannot or will not proceed unless other actions are taken previously or simultaneously.

(iii) Are interdependent parts of a larger action and depend on the larger action for their justification.

The regulation requires consideration of cumulative actions which when viewed with other proposed actions have cumulatively significant impacts and should therefore be discussed in the same impact statement. 40 C.F.R. § 1508.25(a)(2).

contain an estimate of the amount of timber which could be harvested; however, the Court has seen no substantial evidence that future timber harvests which might cause the road to be used for timber-hauling purposes are in any way firm plans. In the Court's view, preparing an EIS analyzing all future timber harvests in the area surrounding the proposed road would require needless speculation and potentially duplicated effort. Forest Service timber sale plans designate some areas for harvest many years in the future, and the Court has seen no specific estimates of the magnitude or likelihood of any of those sales. As the Court sees this situation, future preparation of an EA or an EIS for each timber sale as that sale becomes a firm proposal would further, rather than impair, the NEPA goal of environmental analysis and disclosure.

From the record before it, the most the Court can say is that the Forest Service somehow estimated a potential harvest of 80,000 MBF (million board feet) for the area served by the road. In the context of the EA, that estimate appears to be no more than an attempt at analyzing the road's level of use, especially as that use for timber harvesting might conflict with other possible uses. *See* EA at p. 8. In fact, the conclusion in this section of the EA is that Alternative No. 4 (the one finally selected) would minimize the difficulties associated with the conflicting uses.[5]

For these reasons, the Court accepts the EA as adequate and sees no compelling reason for enjoining construction of the road pending preparation of a full EIS. The Court finds the Forest Service to have examined relevant data regarding environmental impacts and to have reached a reasonable decision based upon that data.

NEPA requires no more than what has been done here, and the Court may proceed no further in examining the relative merits of the chosen alternative in relation to those not chosen. *See Vermont Yankee Nuclear Power Corp. v. N.R.D.C.*, 435 U.S. 519, 553, 98 S.Ct. 1197, 1216, 55 L.Ed.2d 460 (1978); *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 2730 n. 21, 49 L.Ed.2d 576 (1976).

## III. ENDANGERED SPECIES ACT:

The Endangered Species Act ("ESA") prohibits federal agencies from taking any action which jeopardizes any endangered species or adversely alters its critical habitat. 16 U.S.C. § 1536(a)(2). Plaintiffs argue that the Forest Service failed to study the effects of the road upon the Rocky Mountain Gray Wolf.

■ In reviewing an agency's compliance with the Endangered Species Act, this Court must apply the standards set out in 5 U.S.C. § 706(2)(A). *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). On review, the Court must determine whether the agency based its decision on a consideration of relevant factors and whether the decision was arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A); *see Citizens to Preserve Overton Park, Inc.*, 401 U.S. at 416, 91 S.Ct. at 823.

The record demonstrates that the Forest Service did consider the effects of the road as well as other activities within the Nezperce National Forest on the Wolf.[6] Plaintiffs argue, however, that the Forest Service's actions did not comply with certain procedural requirements of the Endangered Species Act. Specifically, plaintiffs

---

5. According to Forest Service officials, the road is to be a multiple-use road, and not one intended exclusively as access for timber harvesting. *See* Affidavit of Harold E. Zeally.

6. The affidavits of David Spores and Paul Moroz give the basis for the Forest Service's determination that no Rocky Mountain Gray Wolves were present in the area surrounding the proposed road. In the biological assessment prepared as

part of the road-planning process, it was determined that "while the habitat components necessary for the Gray Wolf may be present, no evidence of the actual presence of the Wolf could be found. Therefore, it was decided the Jersey Jack Road project would not affect a listed T & E (threatened and endangered) species and consultation was not required." Affidavit of David M. Spores at pp. 4–5.

contend the Forest Service had a duty and violated that duty to do each of the following: (1) request information from the Secretary of the Interior regarding the presence of any endangered species in the area; (2) to conduct biological assessments on the possible effects on any threatened or endangered species in the area; (3) to consult with the Secretary of the Interior regarding the impact of building the road on either endangered species or the critical habitat of an endangered species; (4) to avoid any irreversible or irretrievable commitment of resources which might foreclose alternatives; (5) to ensure that any action in the Jersey Jack Roadless Area is not likely to jeopardize the continued existence of any endangered species; and (6) to ensure that any Forest Service action in the Jersey Jack Roadless Area is not likely to result in the destruction or adverse modification of any critical habitat. *See* plaintiffs' memorandum in support of motion for summary judgment filed January 13, 1982, at p. 45.

Title 16 U.S.C. § 1536, the section of the ESA dealing with interagency cooperation and the responsibility of federal agencies to consider the effect of their actions on endangered species, was substantially changed in 1978.[7] Plaintiffs' contention that the Forest Service violated its duty to request a list of any endangered species in the Jersey Jack area is based in 16 U.S.C. § 1536(c)(1) which states in part:

> To facilitate compliance with the requirements of subsection (a)(2), each Federal agency shall, with respect to any agency action of such agency ... request of the Secretary information whether any species which is listed or proposed to be listed may be present in the area of such proposed action.

Defendants argue that in (c)(1) is limited by the precatory language "[t]o facilitate compliance with the requirements of subsection (a)(2) of this section ...." Defendants would have the Court hold, because the Forest Service claims it knew which endangered species were potentially present and found that none of those species were in fact present in the area surrounding the proposed road, that the Forest Service fulfilled its duty under (a)(1), hence the procedural requirement of a list from the Secretary would have added nothing and was not required.

The Court is somewhat sympathic to the Forest Service argument that it knew several endangered species may be present in the area by its own investigation, concluded that none were in fact present, and therefore a list was not required. It may well be true that requesting a list of endangered species in the area would not have given the Forest Service any further information.

According to Forest Service officials, there is close cooperation between wildlife biologists with Interior and the Forest Service. Because more wildlife biologists are employed by the Forest Service, Forest Service biologists are at times used by Interior. In fact, a letter from Danial Herrig, Field Supervisor of the Ecological Services Division of Interior to Donald Biddison, the Nezperce Forest Supervisor, demonstrates the Interior's opinion that the Forest Service possessed similar knowledge of endangered species in the area as Interior.

It appears to the Court, however, that the statute does require the agency to obtain the list before undertaking "any agency action." *See Village of False Pass v. Watt*, 565 F.Supp. 1123, 1153 (D.Alaska

---

**7.** Before 1978, 16 U.S.C. § 1536 read as follows: The Secretary shall review other programs administered by him and utilize such programs in furtherance of the purposes of this Act. All other Federal departments and agencies shall, in consultation with and with the assistance of the Secretary, utilize their authorities in furtherance of the purposes of this Act by carrying out programs for the conservation of endangered species and threatened species listed pursuant to Section 4 of this Act and by taking such action necessary to insure that actions authorized, funded, or carried out by them do not jeopardize the continued existence of such endangered species and threatened species or result in the destruction or modification of habitat of such species which is determined by the Secretary, after consultation as appropriate with the affected States, to be critical.

1983) *aff'd, Village of False Pass v. Clark,* 733 F.2d 605 (9th Cir.1984). The Court cannot say, as a matter of law, that proposing and building a multiple-use road is an action which will not jeopardize the continued existence of any endangered species or destroy critical habitat. The Court therefore must conclude that the Forest Service had a duty, and failed in that duty, to inquire of the Fish and Wildlife Service and obtain the list spoken of in 16 U.S.C. § 1536(c)(1).

The question remaining is how the Court should treat the Forest Service's failure to inquire of Interior before proceeding with its road construction proposal. A party asserting a violation of the Endangered Species Act has the burden of showing the proposed action would have some prohibited effect on an endangered species or its critical habitat. *See Palila v. Hawaii Dept. of Land and Natural Resources,* 639 F.2d 495, 497 (9th Cir.1981). Plaintiffs fail to demonstrate how the request for a list from Interior would have given the Forest Service any additional information requiring formal consultation under the Endangered Species Act. The Court, therefore, can see no basis for enjoining road construction absent some evidence that requesting the list from Interior would in any way require the Forest Service to do more than has been done. In summary, the Court cannot see how the failure to inquire, though mentioned in the Act as the initial step in any proposal for agency action, has harmed or injured plaintiffs in any respect.

The Court would likely reach a different result had the Forest Service denied the potential presence of the Wolf, or had it lacked knowledge of threatened or endangered species potentially in the area. On facts of that type, the Court would have no difficulty finding the Forest Service's failure to comply with the inquiry requirement of 16 U.S.C. § 1536(a) caused some injury to plaintiffs. Here, however, the Forest Service has undertaken sufficient study and action to further the purposes of the Endangered Species Act. Therefore, the agency's decision to construct the road was not arbitrary and capricious.

## IV. NATIONAL FOREST MANAGEMENT ACT

Plaintiffs take the position that a 1981 change to the National Forest Management Act ("NFMA"), 16 U.S.C. § 1600 *et seq.* requires the Forest Service to forego any proposal for road construction unless the expected revenue from the timber in the area to be served by the road exceeds the cost of road construction.

Both the NFMA and the National Forest Roads and Trails System Act (FRATA) 16 U.S.C. § 535 *et seq.* contain language to the effect that forest roads are to constructed in an economical and environmentally sound basis so as to permit maximum economy in harvesting timber. *See* 16 U.S.C. § 1608(a) and 16 U.S.C. § 535. Plaintiffs interpret the terms "economically sound," to mean that the Forest Service must justify construction of the Jersey Jack Road by demonstrating that timber sale revenues from harvesting the area will exceed the cost of building that road.

Title 16 U.S.C. § 1608(a) sets forth the congressional purpose in enacting the National Forest Management Act. That section states:

(a) *Congressional declaration of policy: time for development; method of financing; financing of forest development roads.* The Congress declares that the installation of a proper system of transportation to service the National Forest System, as is provided for in Public Law 88–657, the Act of October 13, 1964 (16 U.S.C. 532–538) [16 USCS §§ 532 et seq.], shall be carried forward in time to meet anticipated needs on an economical and environmentally sound basis, and the method chosen for financing the construction and maintenance of the transportation system should be such as to enhance local, regional, and national benefits: Provided, That limitations on the level of obligations for construction of forest roads by timber purchasers

shall be established in annual appropriation Acts.

■■■■ After examining both the NFMA statutory language and the pertinent legislative history, the Court is unpersuaded by plaintiffs' interpretation of the Act. The gist of the Act appears to be a congressional concern with the methods of financing forest roads rather than the requirement that the roads produce an absolute profit. By amending NFMA, Congress was seeking to alleviate certain budgetary problems associated with "backdoor spending," one form of financing forest roads.[8] In the Senate Report accompanying the 1981 amendment to NFMA, it was noted that backdoor spending "is the *only* Forest Ser-

vice program where the agency has the authority to 'appropriate' revenue without any congressional control or any standard spelled out in law as to when and how this may be done." S.Rep. No. 93–686, 93d Cong., 2d Sess. *reprinted in* 1974 U.S.Code Cong. & Ad.News 4060, 4077. Congress, it seems, was most concerned with decreasing the prevalent dependence on backdoor spending.[9] In particular, Congress found it necessary to regulate backdoor spending because it was not subject to budgetary control, funds appropriated for forest roads were left unspent, the total expenditures for forest road building were not readily ascertainable, county governments lost revenue on timber sales caused by backdoor financing of roads,[10] and it decreased flexi-

---

**8.** The two methods of financing forest roads are "direct appropriations" and "backdoor spending." S.Rep. No. 93–686, 93d Cong., 2d Sess. *reprinted in* 1974 U.S.Code Cong. & Ad.News 4060, 4076. "Direct appropriation" refers to the direct supplying and designation of funds by Congress whereby Congress retains control over the complete budgetary process. "Backdoor spending" refers to the practice of the Forest Service reducing the appraised price of the timber to be sold by the estimated road costs associated with harvesting that timber. *Id.*

**9.** However, when timber purchasers are granted a reduced price to construct a road under a timber sale contract, the amount of reduction is based on the "estimated cost" for a road that may not have yet been designed (in fact the purchaser may subsequently design it under a design allowance in the timber contract), there is no "special account" created into which funds are placed, and thus no accountability on the part of either the Forest Service or the timber purchaser.

Since the allowance may cover both temporary roads and permanent roads, it is impossible to tell what was actually done under the "allowance." In fact, since the whole procedure is based upon the use of the "estimated cost", rather than a bid price to construct roads, the timber purchaser may incur a loss if his actual cost exceeds the Forest Service estimate or he may secure a windfall if his actual cost is less than the "estimated cost."

The Secretary has adequate rulemaking authority already to revise procedures. The reform that is proposed in this legislation goes to the broader policy issue; the unwillingness of the Executive to voluntarily follow the request by the Congress that greater use be made of appropriated funds under the Highway Act and 16 U.S.C. 501 authorizations to

secure roads that will become a part of the permanent National Forest Transportation System.

There is another impact of the failure to use authorizations and reliance on revenue reductions. The allocation of appropriated funds to timber purchasers to supplement the cost of road construction and for engineering, surveys, plans and supervision of timber purchaser work jumped from $21 million in 1972 to $90 million in 1975. [footnote omitted]

In the past three years, there have been growing demands upon the National Forests to provide more of every one of the multiple uses and resources and insistent demands that there be better forest management and that timber be better offered for sale. Despite all of these facts, the appropriated funds available to construct permanent road has declined from $100 million to virtually nothing; the dependence on timber purchaser construction has almost doubled and constitutes the entire road program. In addition, the resultant revenue reductions, which in 1972 had an adverse impact on the counties of $25 million, will jump to about $50 million in 1975.

The Committee recognizes that where roads are intended only for that timber sale and are not to become a part of the permanent road network that timber purchaser construction may be a mutually beneficial way to proceed. *Legislative History, supra* n. 7 at 4078–9.

**10.** There was particular concern over the inequality of county revenues from forest service timber sales where the two different financing methods were employed.

The purpose of this language is to promote a reasonable allocation of methods of securing construction of roads so that a few counties do not have their already low level of

bility in the manner of constructing and maintaining forest roads. *Id.* at 4077–80.

The Court is of the opinion that the statutes cited by plaintiffs do not require the strict cost-benefit analysis urged by plaintiffs. Although the Forest Service must analyze both the costs and benefits of any road proposal, the Court fails to see any clear congressional mandate that timber sale revenues exceed construction costs of accessing the timber. Accordingly, the Court concludes that plaintiffs' claims under NFMA and FRATA are based upon a novel interpretation of both the statutory language and legislative purpose which is unsupported by any persuasive authority.

## V. WILD AND SCENIC RIVERS ACT

The proposed road is near the Salmon River, a portion of which has been congressionally designated as a Wild and Scenic River. *See* Central Idaho Wilderness Act, P.L. 96–312, 94 Stat. 948, 952–53 (1980) (that portion of the Salmon River from Corn Creek Campground to Long Tom Bar is part of the National Wild and Scenic Rivers System). Rivers so designated benefit from federal protection. Federal agencies with jurisdiction "over any lands which include, border upon, or are adjacent to" these rivers "shall take such action respecting management policies, regulations, contracts, plans affecting such lands ... as may be necessary to protect such rivers." 16 U.S.C. § 1283(a). Agencies are to pay particular attention to "scheduled timber harvesting, road construction and similar activities which might be contrary to purposes" of the Act. *Id.*

Although the parties hold divergent views as to whether the proposed road is on "adjacent" land within the meaning of the Wild and Scenic Rivers Act, the Court will assume for purposes of ruling on the

present motions that the road would be adjacent to the Salmon River.

Plaintiffs contend the Forest Service failed to appropriately assess the road's impact on the river and adequately plan to mitigate any adverse impact. In particular, plaintiffs argue because the area soils are fragile and highly erodible, that road construction would increase sedimentation of the Salmon.

The Jersey Jack Road EA noted that:
The entire area of approximately 41,000 acres drains into the Salmon River via several major tributaries, notably Rhett, Blowout, Comstock, Crooked, Noble, and Little Mallard Creeks along with numerous lesser feeder streams.

EA at p. 4.

■■ The EA demonstrates that the Forest Service considered the sedimentation from the proposed road, and Forest Service officials represent their intent to use any necessary mitigation techniques to control sedimentation. *See* Affidavits of Tom Erkert and Michael Cook. At this stage of road construction process, the Court can see nothing more required of the Forest Service under the Wild and Scenic Rivers Act. Certainly more may be required as the road is actually built, for the Act places a continuing obligation on all agencies to protect designated rivers. *See* 16 U.S.C. § 1283(a).

Therefore, the Court finds nothing arbitrary or capricious regarding the decision to construct the road when viewed under the requirements of the Wild and Scenic Rivers Act.

## VI. CONCLUSION:

In summary, the Court concludes that the Forest Service's decision to build the road without first preparing an EIS did not violate NEPA, nor was the FONSI unrea-

payments of revenues reduced or diminished by undue reliance on timber purchaser construction contracts in their local forest while another national forest, with more substantial payments to its counties, receives substantial assistance in road construction via appropriated funds. For example, the reliance on

timber purchaser, revenue reduction construction in a county that receives a payment in lieu of taxes from the national forests of $9.00 per acre is far less than it is on one whose payments are 50 cents or only 15 cents per acre.

*Legislative History, supra* n. 7 at 4080.

sonable in light of the EA's scope or conclusions. Although the Court has found a failure by the Forest Service to strictly adhere to the information gathering requirements of the Endangered Species Act, a right to relief because of that failure has not been established. The Court further finds no violation of the National Forest Management Act, the National Forest Roads and Trails Act, or the Wild and Scenic Rivers Act.

For the reasons expressed above, the Court will grant defendants and intervenors' motions for summary judgment, and deny plaintiffs' motion.