**ENVIROCARE OF UTAH,
INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 99–76C.

United States Court of Federal Claims.

June 11, 1999.

William A. Shook, Washington, D.C., for plaintiff. Kelley P. Doran, of counsel.

Marian E. Sullivan, Washington, D.C., with whom were Acting Assistant Attorney General David W. Ogden, Director David M. Cohen, and Deputy Director Sharon Y. Eubanks, for defendant. Jerusha L. White, Ann L. Wright, and Noelle J. Simpson, of counsel.

## Opinion and Order

WEINSTEIN, Judge.

This pre-award bid protest case, brought pursuant to 28 U.S.C. § 1491(b)(1), is before the court on defendant's motion to dismiss, in part, and the parties' cross-motions for judgment on the administrative record, following an on-the-record mini-trial.

On February 17, 1999, plaintiff filed a complaint for declaratory and injunctive relief and moved for a preliminary injunction. Plaintiff's complaint contains five counts: (1) the solicitation fails to utilize mandatory Federal Acquisition Regulations (FAR)[1] procedures for the acquisition of commercial items; (2) the solicitation permits the award of an illusory contract; (3) the solicitation does not elicit the best value because it fails to consider transportation costs; (4) the solicitation contains defective specifications because it states that certain radioactive wastes are not subject to regulation under the Atomic Energy Act; and (5) the United States Army Corps of Engineers (Corps) lacks a valid delegation of authority to conduct this procurement.

After a February 18, 1999 hearing on plaintiff's motions for preliminary injunction and a temporary restraining order, defendant agreed to delay the contract award pending the court's decision in this case; however, the court permitted defendant to continue to conduct all pre-award evaluation activities.[2]

The administrative record was filed, under seal, on March 5, 1999.

On March 11, 1999, International Uranium (USA) Corporation (IUSA), an offeror on the solicitation, moved to intervene in this action. On March 25, 1999, the court denied IUSA's motion and permitted IUSA's participation in this action as *amicus curiae*.

On April 28, 1999, once the parties' motions were fully briefed, the court heard oral arguments. The court determined that a factual dispute existed regarding the allegations set forth in Count I of plaintiff's complaint and ordered a mini-trial to address these allegations. The mini-trial was held on May 13, 1999, in Washington, D.C.

Upon reviewing the administrative record (AR) and the parties' briefs, the court concludes that plaintiff's claims do not merit relief. Accordingly, for the reasons discussed below, defendant's motions to dismiss, in part, and for judgment on the administrative record, are granted. Plaintiff's motion for judgment on the administrative record is denied.

## Facts

The relevant facts set forth below, which are taken from the AR, are not in dispute.

On December 21, 1998, the Corps issued Solicitation No. DACW41–99–R–0004 for up to ten indefinite-delivery/indefinite-quantity contracts for the removal of five different types of waste at sites within the Formerly Utilized Sites Remedial Action Program (FUSRAP). AR at 20, 22.[3] The five types of waste were: (1) low-activity radioactive waste; (2) naturally-occurring radioactive materials; (3) 11(e)(2) materials, generated prior to November 18, 1979; (4) hazardous mixed waste materials; and (5) Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901–6933 (RCRA) hazardous waste containing residual radioactivity. AR at 22. Each contract awarded was to deal with at least one, and a maximum of five, types of waste. Contracts for each type of waste would be awarded to a maximum of two bidders. AR at 22.

Section B of the solicitation estimated the total value of all contracts to be awarded at

---

1. The FAR is codified at title 48 of the Code of Federal Regulations. Section references are to the provisions of title 48 effective when the solicitation was issued on December 21, 1998.

2. On March 1, 1999, defendant moved for entry of a protective order following the form of the order attached to its motion. On March 5, 1999, the court ordered the adoption of a revised protective order.

3. The Corps amended the solicitation three times prior to plaintiff's complaint, on January 14, 1999, AR at 174; February 1, 1999, AR at 209; and February 5, 1999, AR at 379. The Corps also has amended the solicitation twice since plaintiff's complaint, on February 26, 1999, and March 2, 1999.

$400 million. AR at 22. Each contract was to have a five year base period with a five year option period. AR at 23. The guaranteed minimum for the base period of each contract was the lesser of: (1) two percent of the total acquisition value of the contract, or (2) $500,000. The solicitation stated that the award would be made "to the responsible offeror ... whose proposal conforms to the solicitation and is determined to be the Best Value to the Government .... The technical evaluation factors ... are approximately equal to price." AR at 184; *see also* FAR § 2.101 ("Best value means the expected outcome of an acquisition that, in the Government's estimation, provides the greatest overall benefit in response to the requirement.").

The solicitation required offerors to "provide all data necessary to fully support the prices in the proposal schedule, .... includ[ing] all- labor rates, material costs, equipment costs, surcharges, disposal taxes, closure fund, overheads, and profit." AR at 363. However, offerors expressly were *not* to include transportation costs in their price proposal, other than costs of "incidental transfer of materials at or near the disposal facility." AR at 215.

Although the solicitation stated that the 11(e)(2) waste is not subject to regulation under the Atomic Energy Act (AEA), AR at 224, the solicitation required contractors to dispose of waste in accordance with "all applicable or relevant and appropriate Federal, State, and local regulations and permits." AR at 229. The solicitation required the contractor to obtain the applicable permits and/or licenses within twelve months of the contract award. AR at 25. The contractor agreed that, if it could not obtain the necessary permits, it waived the contract's guaranteed minimum and acceded to a no-cost termination of the contract for convenience. AR at 25.

### Motion to Dismiss

In evaluating a motion to dismiss, the court construes all allegations in favor of the non-moving party. *See Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). A motion to dismiss will not be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.* (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). In evaluating a motion to dismiss for lack of jurisdiction, the court presumes that all undisputed factual allegations contained in the non-moving party's complaint are true. *See Reynolds v. Army & Air Force Exch. Serv.,* 846 F.2d 746, 747 (Fed. Cir.1988) (the court may consider all relevant evidence if the alleged jurisdictional facts are in dispute). However, conclusory allegations and unwarranted factual inferences will not avert dismissal. *See Bradley v. Chiron Corp.,* 136 F.3d 1317, 1322 (Fed.Cir.1998). Plaintiff retains the ultimate burden of establishing jurisdiction. *See Rocovich v. United States,* 933 F.2d 991, 993 (Fed.Cir.1991).

Before the court reaches the merits of this dispute, it first must determine whether it has jurisdiction. *See Newport News Shipbuilding & Dry Dock Co. v. Garrett,* 6 F.3d 1547, 1563 (Fed.Cir.1993). Defendant here argues that this court lacks jurisdiction to consider the radioactive materials licensing issues raised in plaintiff's complaint, specifically, whether: (1) the Corps requires a Nuclear Regulatory Commission (NRC) license in order to conduct its FUSRAP activities; and (2) offerors require an NRC license in order to accept 11(e)(2) byproduct material for disposal.

### NRC License

The first issue is whether the Corps requires an NRC license in order to conduct the FUSRAP activities. Under the AEA, the NRC has authority to license the use of specified radioactive materials, *see* 42 U.S.C. §§ 2061–2078, 2091–2099, 2111–2114, including "the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its source material content." 42 U.S.C. § 2014(e). This material is known as 11(e)(2) waste. AR at 224.

Challenges to NRC licensing decisions are governed by the Hobbs Act, 28 U.S.C. §§ 2341–2351. The Hobbs Act grants the United States courts of appeals "exclusive

jurisdiction to enjoin, set aside, suspend ... all final orders of the [NRC] made reviewable by section 2239 of title 42 [the AEA]." 28 U.S.C. § 2342(4).[4] Section 2239 of the AEA provides that proceedings involving the "granting, suspending, revoking, or amending, of any license" are subject to exclusive review under the Hobbs Act. Thus, all final NRC licensing decisions are subject to judicial review exclusively in the federal courts of appeals. *See also Florida Power & Light Co. v. Lorion,* 470 U.S. 729, 743, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985).

■ "It is well settled that ... a statute which vests jurisdiction in a particular court cuts off original jurisdiction in other courts in all cases covered by that statute." *Telecommunications Research & Action Ctr. v. FCC,* 750 F.2d 70, 77 (D.C.Cir.1984); *see also Compensation Dep't of District Five, UMW v. Marshall,* 667 F.2d 336, 340 (3d Cir.1981); *Assure Competitive Transp., Inc. v. United States,* 629 F.2d 467, 471 (7th Cir.1980). Thus, courts will dismiss a claim challenging NRC licensing decisions if it is brought under a more general jurisdictional statute. *See Northwest Resource Info. Ctr., Inc. v. National Marine Fisheries Serv.,* 25 F.3d 872, 875 (9th Cir.1994); *Michigan v. United States,* 994 F.2d 1197, 1202–03 (6th Cir.1993). This rule is particularly applicable in the Court of Federal Claims, because our jurisdiction is statutorily granted and strictly construed. *See Bowen v. Massachusetts,* 487 U.S. 879, 908 n. 46, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1988); *see also United States v. King,* 395 U.S. 1, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969).

■ On April 5, 1999, the NRC determined that it lacks the authority to license the Corps' FUSRAP activities. *See* Issuance of Director's Decision, 64 Fed.Reg. 16,504 (1999). This decision responded to a request by the Natural Resources Defense Council that the NRC exert its licensing authority over the Corps' FUSRAP activities. The NRC determined that, under the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601–

9675 (CERCLA), the Corps did not require a license to conduct onsite remedial action. *See* 64 Fed.Reg. 16,504; *see also* 42 U.S.C. § 9621(1) ("No Federal, State, or local permit shall be required for the portion of any removal or remedial action conducted entirely onsite, where such remedial action is selected and carried out in compliance with this section."). This decision became effective as a "final action" of the NRC on April 27, 1999. *See* 64 Fed.Reg. 16,504.

The issue addressed in the NRC's decision is identical to that raised in Count IV of plaintiff's complaint: whether the Corps' FUSRAP activities are subject to NRC licensing. Because this decision constitutes a "final action" of the NRC, the federal courts of appeals have exclusive judicial review. *See* 28 U.S.C. § 2342(4); 42 U.S.C. § 2239. Accordingly, this court lacks jurisdiction over this allegation.

### 11(e)(2) License

■ The next issue is whether offerors under this solicitation require an NRC license in order to accept 11(e)(2) byproduct material for disposal. The solicitation asserts that 11(e)(2) materials generated prior to November 8, 1978 are "not subject to regulation under the Atomic Energy Act authority." AR at 224. Plaintiff alleges that this statement renders the solicitation "defective by misstating the law," and allows a contract award in violation of FAR § 1.602–1(b), which provides that "[n]o contract shall be entered into unless the contracting officer ensures that all requirements of law, executive orders, regulations, and all other applicable procedures, including clearances and approvals, have been met." The court finds that this allegation fails to state a claim upon which relief can be granted.

Plaintiff correctly points out that the NRC's April 5, 1999, decision does not address whether a license is required for radioactive waste disposal conducted *offsite.* In fact, the NRC's decision explicitly left that issue for another day: "We note, however,

---

**4.** The Hobbs Act actually refers to the Atomic Energy Commission, not the NRC. Pursuant to the Energy Reorganization Act of 1974, Pub.L.

No. 93–438, 88 Stat. 1242, 42 U.S.C. § 5841, the Hobbs Act now applies to final orders of the NRC.

that the waiver in [CERCLA] does not apply to off-site activities.... While the Corps will be following the NRC's requirements in this area, it is unlikely that any specific license requirements would apply to shipments from FUSRAP sites." 64 Fed.Reg. 16,504, 16,507 & n.20. Thus, the NRC decision does not resolve plaintiff's allegation that offerors require an NRC license in order to dispose of 11(e)(2) material.

Nevertheless, the court finds that this allegation fails to state a claim upon which relief can be granted. Plaintiff asserts that the solicitation's statement that pre–1978 11(e)(2) material is not subject to NRC licensing violates FAR § 1.602–1(b), which prohibits contracts unless the contract satisfies all legal requirements. This provision, however, applies to a contract award, not to a solicitation. In fact, no contract will be awarded in this case unless and until the awardee acquires all necessary licenses. AR at 25. Thus, even assuming, *arguendo*, that pre–1978 11(e)(2) materials *were* subject to NRC licensing, plaintiff fails to allege any "clear and prejudicial" violation of a procurement statute or regulation, *see Central Ark. Maintenance, Inc. v. United States,* 68 F.3d 1338, 1342 (Fed.Cir.1995), because the Corps at this time has not *awarded* and issued task orders to an unlicensed bidder. In sum, the Corps would not violate FAR § 1.602–1(b) by awarding a contract to a facility with an NRC license.

Nor would the Corps violate FAR § 1.602–1(b) by awarding a contract to an offeror *not* having an NRC license, because the solicitation warned contractors to dispose of waste in accordance with "all applicable or relevant and appropriate Federal, State, and local regulations and permits." AR at 229. The solicitation expressly requires contractors to obtain all applicable licenses and/or permits within 12 months of the contract award. AR at 25. Thus, until the Corps issues a task order to an unlicensed vendor, a result not contemplated by this solicitation, neither FAR § 1.602–1(b), nor any other procurement law or regulation, is violated. Thus, plaintiff's contention that the solicitation is

contrary to the AEA fails to state a claim, on these facts, upon which relief can be granted.

### Summary Judgment

Summary judgment is appropriate when the court finds both that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c) of the Rules of the United States Court of Federal Claims (RCFC); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A material fact preventing summary judgment is one that is relevant and necessary to establishing or defending against the claim and that may affect the outcome of the decision; an issue is genuine if a reasonable finder of fact could decide the question in favor of the non-movant. *See KeyStone Retaining Wall Sys., Inc. v. Westrock, Inc.,* 997 F.2d 1444, 1449 (Fed.Cir. 1993); *Opryland USA Inc. v. Great Am. Music Show, Inc.,* 970 F.2d 847, 849–50 (Fed. Cir.1992). Motions for judgment on the administrative record are evaluated under the same standards as motions for summary judgment pursuant to RCFC 56(a). *See* RCFC 56.1(a).

Summary judgment is not a disfavored means of resolving disputes; on the contrary, it is an "integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 1); *see also Avia Group Int'l, Inc. v. L.A. Gear California, Inc.,* 853 F.2d 1557, 1560 (Fed.Cir.1988); *Sweats Fashions, Inc. v. Pannill Knitting Co.,* 833 F.2d 1560, 1562 (Fed.Cir.1987). The fact that both parties have moved for summary judgment, however, does not relieve the court of its responsibility to determine the appropriateness of summary disposition. *See Prineville Sawmill Co. v. United States,* 859 F.2d 905, 911 (Fed.Cir.1988).

### Pre–Award Bid Protests

In pre-award bid protests brought under the Tucker Act,[5] courts apply the standard of

---

5. 28 U.S.C. § 1491(b)(1) (1994 & Supp.1998) provides:

review for agency action established by the Administrative Procedure Act, 5 U.S.C. § 706 (1994). *See* 28 U.S.C. § 1491(b)(4). An agency procurement decision will be set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The scope of review is confined to the administrative record, *i.e.*, to the record before the decision maker when the final award decision was made. *See Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973). The court "may award any relief that [it] considers proper, including declaratory and injunctive relief[,] except that any monetary relief shall be limited to bid preparation and proposal costs." 28 U.S.C. § 1491(b)(2).

■ Absent evidence of actual irregularity, the court presumes the regularity of government action. *See Kalvar Corp. v. United States*, 211 Ct.Cl. 192, 543 F.2d 1298, 1301–02 (1976) (holding that government officials are presumed to act in good faith). To rebut this presumption, a plaintiff must present "well-nigh irrefragable proof" that the government acted in bad faith. *Torncello v. United States*, 231 Ct.Cl. 20, 681 F.2d 756, 771 (1982).

In sum, a court may set aside an agency's action only when it has no rational basis, *see M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1306 (D.C.Cir.1971), *i.e.*, when the decision is "totally lacking in reason." *Keco Industries, Inc. v. United States*, 203 Ct.Cl. 566, 492 F.2d 1200, 1206 (1974). If the agency's action is reasonable, the court will not disturb it. *See, e.g., Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 995–96 (Fed. Cir.1996).

■ In addition, to receive injunctive relief, as plaintiff demands here, it must show, not only that the agency's action is unreasonable, but also: 1) that failure to enjoin the procurement will cause irreparable harm; 2) that such harm outweighs any potential harm to third parties; and 3) that injunctive relief is in the public interest. *See FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed.Cir.1993).

■ Not every error requires rejection of the agency's action. *See SMS Data Products Group, Inc. v. United States*, 900 F.2d 1553, 1557 (Fed.Cir.1990); *Excavation Const., Inc. v. United States*, 204 Ct.Cl. 299, 494 F.2d 1289, 1293 (1974). The court will not overturn a solicitation based on *de minimis* errors made during the procurement process. *See Grumman Data Sys. Corp. v. Widnall*, 15 F.3d 1044, 1048 (Fed.Cir.1994) ("overturning awards on *de minimis* errors wastes resources and time, and is needlessly disruptive of procurement activities and governmental programs and operations") (quoting *Andersen Consulting v. United States*, 959 F.2d 929, 932 (Fed.Cir.1992)). In sum, a protester must show, not only an error in the procurement process, but also that the error was "clear and prejudicial." *See Central Ark. Maintenance, Inc. v. United States*, 68 F.3d 1338, 1342 (Fed.Cir.1995); *CACI Field Servs., Inc. v. United States*, 854 F.2d 464, 466 (Fed.Cir.1988).

### *Illusory Contract*

Plaintiff argues that the solicitation's provision that awardees "have 12 months from the date of contract award to acquire the applicable licenses and/or permits ..." results in an illusory contract. AR at 25. Plaintiff points out that if an awardee fails to obtain the necessary licenses and/or permits, the awardee forfeits the contract's guaranteed minimum and agrees to a no-cost termination of the contract for convenience. AR at 25. Plaintiff asserts that this contract would be illusory because the awardee would not have to perform *any* work if it failed to obtain the necessary permits; in fact, plaintiff intimates that an awardee may not even attempt to acquire the permits. Plaintiff

Both the Unites [sic] States Court of Federal Claims and the district courts of the United States shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement. Both the United States Court of Federal Claims and the district courts of the United States shall have jurisdiction to entertain such an action without regard to whether suit is instituted before or after the contract is awarded.

claims that this "unlimited right of exculpation" renders the contract illusory.

"[A] party may not reserve to itself a method of unlimited exculpation without rendering its promises illusory and the contract void." *Torncello v. United States,* 231 Ct.Cl. 20, 681 F.2d 756, 760 (1982). Thus, contracting parties "may not agree that one or both may walk away from all obligations without rendering the contract unenforceable." *Id.* at 764.

Nevertheless, courts must construe contracts so as to avoid rendering them illusory. *See id.* at 761; *Kennewick Irrigation Dist. v. United States,* 880 F.2d 1018, 1032 (9th Cir.1989). One method of rehabilitating an otherwise illusory contract is to imply a requirement of good faith, due diligence, or reasonableness. *See City of Tacoma, Dep't of Pub. Utils. v. United States,* 31 F.3d 1130, 1132 (Fed.Cir.1994); *Misano di Navigazione SpA v. United States,* 968 F.2d 273, 274–75 (2d Cir.1992). Indeed, "it is an implied term of every contract that each party will act in good faith towards the other." *Link v. Department of the Treasury,* 51 F.3d 1577, 1582 (Fed.Cir.1995).

In this case, the awardee's obligation to obtain the required licenses or permits within one year contains an implied duty to act in good faith. In agreeing to act in good faith and use its best efforts to obtain the required licenses, the awardee promises to do positive acts, constituting a legal detriment.[6] This is sufficient consideration to support the government's return promise to hold the contract open. Moreover, the government itself tenders no performance until the appropriate licenses have been acquired. Therefore, the contract is not illusory.

The contract's guaranteed minimum supplies the requisite mutuality of obligation between the parties. *See Mason v. United States,* 222 Ct.Cl. 436, 615 F.2d 1343, 1350 (1980). Thus, the government commits to the contract by guaranteeing a minimum order. Conversely, the contractor relinquishes

this minimum order if it fails to obtain the required licenses.

This type of conditional promise is analogous to sales of real estate contingent upon the buyer's ability to obtain a mortgage loan. The condition would render the promise illusory if the buyer were under no obligation to try to obtain a loan. However, courts hold that the buyer impliedly promises to use his best efforts to obtain the loan and that the contract is therefore not illusory. *See, e.g., Brack v. Brownlee,* 246 Ga. 818, 273 S.E.2d 390 (1980); *Lach v. Cahill,* 138 Conn. 418, 85 A.2d 481 (1951).

### Transportation Costs

Plaintiff argues that the solicitation's failure to consider transportation costs precludes the Corps from conducting a reasonable best value analysis. AR at 167 (award made to proposal offering the best value to the government). Plaintiff asserts that "award could be made to a disposal site that offers low disposal prices even though the site's overall costs could be higher ... due to very high transportation costs because of distance, lack of rail car handling facilities, or other transportation reasons." Complaint ¶ 55. Defendant, on the other hand, states that it will address transportation costs by considering these expenses when awarding the actual task orders under the contract. AR at 58.

The court finds that the Corps' method of evaluating transportation costs is not unreasonable and must be upheld. *See Grumman Data Sys. Corp.,* 88 F.3d at 995–96 (if an agency's action is reasonable, the court will not disturb it). The court notes that it would be well-nigh impossible to evaluate transportation costs in this solicitation. That is, the FUSRAP program encompasses more than 20 sites located across the United States, including Connecticut, Illinois, Maryland, Massachusetts, Missouri, New Jersey, New York, and Ohio. AR at 471. In addition, although the court is not privy to the actual offerors on this solicitation, the Corps' list of potential bidders includes a number of facili-

---

**6.** Evidence at the mini-trial indicated that many potential awardees were close to acquiring the necessary licenses. T107. "T—" refers to the mini-trial transcript.

ties spread across the country, including New Mexico, South Carolina, Texas, Utah, and Washington. AR at 477. Thus, an accurate measure of the transportation costs under the solicitation would be difficult, if not impossible, because of the range of distances separating the offerors from the 21 FUSRAP sites.

As the testimony of Julie Ann Peterson at the mini-trial made clear, at a number of FUSRAP sites, the material has not been adequately characterized to determine the type(s) of waste present. T95; *see also* AR at 469. It therefore would be impossible to reliably evaluate transportation costs for these materials because, without knowing the types of waste present at a given FUSRAP site, the Corps cannot determine which vendors (and at which locations) would be eligible to receive those wastes. Not knowing the locations makes it difficult to assess transportation costs. In addition, until the waste is characterized, the Corps is unable to ascertain the appropriate mode of transportation (*i.e.*, truck or rail), a factor that plaintiff contends significantly affects the cost of transportation. Thus, it appears that the Corps properly elected to omit transportation costs from this solicitation because it could not reliably evaluate these expenses in advance of the selection of awardees.

Furthermore, the Corps does intend to consider transportation costs when issuing the task orders. The solicitation permits contracts for each type of waste to be awarded to a maximum of two bidders. AR at 22. When issuing the task orders under the contracts, the contracting officer must consider a number of factors, including transportation costs. AR at 58. By this point, the contracting officer presumably will know the type of waste present, the location of the waste, and the locations of the potential recipients of the task order. This method of evaluating transportation costs appears to be a more reliable indicator of total costs than plaintiff's proposed method, and, in any event, is not unreasonable. *See Keco Indus.*, 492 F.2d at 1206 (the standard of review is deferential; the court must uphold the agency's decision if reasonable).

Finally, the government has a legitimate basis for delaying the consideration of transportation costs, because it might engender greater competition and experience among other waste disposal firms (currently it appears that plaintiff is the only entity immediately capable of performing 11(e)(2) disposal). For the foregoing reasons, plaintiff's protest on this ground is denied.

### *Procurement Authority*

 Plaintiff argues that the Corps lacks procurement authority over the FUSRAP program. In 1997, Congress directed the Corps to "execute the Formerly Utilized Sites Remedial Action Program to clean up contaminated sites throughout the United States where work was performed as part of the Nation's early atomic energy program." Energy and Water Development Appropriations Act, Pub.L. No. 105–62, 111 Stat. 1320 (1997); *see also* Energy and Water Development Appropriations Act, Pub.L. No. 105–245, 112 Stat. 1838 (1998). Plaintiff, however, claims that an appropriation, such as this, standing alone, does not confer procurement authority.

 That is incorrect. Congress can and frequently does "legislate" in appropriation acts. *See Robertson v. Seattle Audubon Society*, 503 U.S. 429, 440, 112 S.Ct. 1407, 118 L.Ed.2d 73 (1992); *United States v. Will*, 449 U.S. 200, 222, 101 S.Ct. 471, 66 L.Ed.2d 392 (1980); *United States v. Dickerson*, 310 U.S. 554, 60 S.Ct. 1034, 84 L.Ed. 1356 (1940); *Bickford v. United States*, 228 Ct.Cl. 321, 656 F.2d 636, 642 (1981). Like any other statute, appropriation acts are passed by both houses and signed by the President (or enacted over the president's veto). As such, they are "just as effective a way to legislate as are ordinary bills relating to a particular subject." *Friends of the Earth v. Armstrong*, 485 F.2d 1, 9 (10th Cir.1973).

The cases cited by plaintiff, *Andrus v. Sierra Club*, 442 U.S. 347, 99 S.Ct. 2335, 60 L.Ed.2d 943 (1979), and *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978), are readily distinguishable. *Andrus* dealt primarily with the issue of whether appropriation requests by federal agencies constituted "proposals for

legislation" under the National Environmental Policy Act, 42 U.S.C. § 4332(C). The Court did not address whether Congress could legislate through appropriations bills, other than citing Congress' own procedural rules which discourage the practice. *See Andrus,* 442 U.S. at 359–61, 99 S.Ct. 2335.

*Hill* also may be distinguished on its facts. In that case, Congress authorized construction · of the Tellico Dam and appropriated funds for that purpose. Congress subsequently passed the Endangered Species Act of 1973(ESA). It was eventually determined that continued construction of the dam would violate the ESA. The Court's decision addressed whether Congress, in continuing to make yearly appropriations for the completion of the dam project, modified the ESA. The court found it did not, finding that the lump-sum appropriations were insufficient to repeal the ESA by implication. *See Hill,* 437 U.S. at 191, 98 S.Ct. 2279. Thus, the holding does not forbid Congress from legislating through appropriations. Rather, the case merely requires that, if Congress wants to modify or repeal existing law via appropriations acts, it must do so explicitly. *See id.* at 190–91. This principle is very well-established. *See Robertson,* 503 U.S. at 440, 112 S.Ct. 1407; *Will,* 449 U.S. at 222, 101 S.Ct. 471.

Plaintiff also cites the rules of both the Senate and the House of Representatives, which ostensibly prohibit "legislating" in appropriations acts. *See* Charles W. Johnson, *Rules of the House of Representatives,* H.R. Doc. No. 272, 104th Cong., 2d Sess. § 834a (1997) (*House Rules*); Committee on Rules and Administration, U.S. Senate, *Senate Manual,* S. Doc. No. 1, 104th Cong., 1st Sess. 14–15 (1995) (*Senate Rules*). However, these rules are not self-enforcing. Rather, they merely subject the offending provision to a point of order and do not affect the legislation's validity if the point of order is not raised (or is raised and not sustained) prior to enactment. *See House Rules* § 829; *Senate Rules* 16; *see also* General Accounting Office, *Principles of Federal Appropriations Law* 2–39 (2d ed.1991). As such, these rules do not render otherwise binding legislation invalid.

### *"Commercial Item"*

■ In Count I of its complaint, plaintiff challenges the solicitation's failure to use mandatory FAR procedures for the acquisition of "commercial items." The court determined that a factual dispute existed with respect to this issue and held a minitrial, on May 13, 1999, to elicit witness testimony. Upon considering the trial testimony and the parties' briefs, the court concludes that the radioactive waste disposal service at issue here is not a "commercial item" and that the Corps did not err in failing to treat the service as such.

Under the FAR, special procedures [7] "shall be used for the acquisition of supplies and services that meet the definition of commercial items." FAR § 12.102(a). "Commercial items" include "[s]ervices of a type offered and sold competitively in substantial quantities in the commercial marketplace based on established catalog or market prices for specific tasks performed under standard commercial terms and conditions." FAR § 2.101. Thus, for a service to be a commercial item, there must be: (1) a competitive market for the service, and (2) established catalog or market prices for the service.

The FAR offers no guidance as to when a competitive market exists. Nor does it define "market price." However, the legislative history to the National Defense Authorization Act for 1996, which added the term "market prices" to the Federal Acquisition Streamlining Act definition of "commercial item," *see* 41 U.S.C. § 403(12)(F), suggests that "market prices are current prices that are established in the course of ordinary trade between buyers and sellers free to bargain and that can be substantiated from sources independent of the offeror." H.R. Conf. Rep. No. 104–450, at 967 (1996). The

---

7. For example, an agency need not apply certain laws, such as the Walsh–Healey Act, 41 U.S.C. § 43; and the Drug–Free Workplace Act of 1988, 41 U.S.C. § 701. *See* FAR § 12.503. The agency may also use streamlined procedures for soliciting and evaluating offers, for example, by combining the Commerce Business Daily synopsis and the solicitation into a single document. *See* FAR § 12.603(a).

parties appear to concede that no catalog prices exist for radioactive waste disposal services.

Plaintiff's trial witness was Mr. Ali Rafati, Envirocare's senior vice president in charge of business development. T12. When asked how he would obtain market prices, Mr. Rafati stated that he "would go directly to the competition to get accurate, independent verification." T42. He further testified, "[I]f I were to acquire disposal services as a consultant to the customer, I would go directly to the source; because I've seen too many numbers that do not reflect the reality when it becomes a third-party quotation." He also admitted that he could not name his competitors' prices with any degree of accuracy, stating that

> *a lot of that is speculation.* I think that's why I also mentioned to you that hearsay isn't always the best way to go about independent verification of market pricing. I try to avoid speculation and try to use the data points that we can verify. *And, clearly, we haven't seen anybody's prices,* and everybody is playing it clean and playing it effectively and *making sure that that's not public knowledge.*

T56–57 (emphasis added).

Mr. Rafati's own testimony indicates that there is no market price for radioactive waste disposal services. The key element of a market price is that it "can be substantiated from sources independent of the offeror." However, Mr. Rafati admitted that the only reliable way to obtain an offeror's price is to ask the offeror.

Plaintiff's only evidence of an independent source of verifying competitors' prices is an article in the trade publication, *EI Digest,* entitled "Hazardous Waste Landfills 1997." *See* Pl. Exh. 1. However, this article lists only price ranges for hazardous waste disposal; it does not offer specific prices for listed vendors. Furthermore, this article concerns only *hazardous* waste disposal prices. It does not concern *radioactive* waste disposal prices. Nor does it list prices for each of the five types of waste under the solicitation. In fact, only two types of waste covered by this

solicitation are "hazardous waste," as defined by RCRA. AR at 224; T90. The *EI Digest* article therefore is inapposite to this dispute.

The court's determination that there is no market price for radioactive waste disposal services is bolstered by the testimony of Julie Ann Peterson, defendant's witness. Ms. Peterson is a health physicist with the Corps, specializing in radiation safety. T86. She holds bachelor's and master's degrees in biology and has received formal training in health physics from the NRC. T87. Prior to her work for the Corps, Ms. Peterson was a health physicist for the state of Nebraska, supervising the state's radioactive materials program. T86–87. The court found this witness to be highly credible, based on her knowledge of the facts and issues presented in this case.

Ms. Peterson explained that "standard rates do not exist because unit disposal rates have to be determined on a case-by-case basis," dependent upon many factors, including volume, shipment configuration, type of packaging, amount of debris, moisture content, and the concentration of isotopes present. T102–03. In addition, Ms. Peterson related a conversation she had with Mr. Rafati, in which Mr. Rafati explained that "each time the Corps has waste feed in the FUSRAP program ... [the Corps] should consult with [Envirocare] and determine case-by-case if that is the best disposal rate or if, in fact, for that particular case whether that price could be lower." T104. Ms. Peterson took this to mean that Envirocare's prices "are negotiable." T104.

Mr. Rafati confirmed that Envirocare's prices are negotiable and determined on a case-by-case basis. Mr. Rafati explained that Envirocare determines its prices based on a number of factors, including volume, packaging, mode of transportation, type of waste, and time of year. T19–20. In addition, Mr. Rafati admitted that Envirocare has priced 11(e)(2) waste disposal services differently in the past, largely dependent upon factors unique to each contract. T47–53. Finally, on cross-examination, Mr. Rafati read from Envirocare's own, standard, cus-

tomer information manual, which states: "Since Envirocare does not have a standard rate sheet, each customer must sign a specific treatment disposal contract with Envirocare." T84.

Thus, the trial testimony indicates that prices for radioactive waste disposal are incapable of substantiation "from sources independent of the offeror." Both witnesses testified that prices vary based on numerous factors and are negotiated on a case-by-case basis. In addition, Mr. Rafati admitted that the only reliable way to obtain pricing information is to ask the offeror. Based on this testimony, the court concludes that there is no market price for radioactive waste disposal. Accordingly, these services do not fall within FAR 2.101's definition of "commercial items." Therefore, the Corps did not improperly fail to conduct this procurement as a commercial item acquisition.

Even if there were an established market price for radioactive waste disposal services, the court finds that the market is not competitive. The relevant market for the items procured under this solicitation is all facilities equipped to handle all five types of waste under the solicitation. It appears that, besides Envirocare, few, if any, sites are equipped to handle all five types of waste under the solicitation. Mr. Rafati stated that only Envirocare and Waste Control Specialists can take all five, although he said that U.S. Ecology and Barnwell "may be candidates." T70–71. Ms. Peterson, on the other hand, was persuasive that only one firm is capable of disposing of all five types of waste—Envirocare. T91. In addition, for the largest portion of waste under the solicitation, 11(e)(2) waste generated prior to 1978 (approximately 75% of the total, AR at 22), the government is the only source. T96. Therefore, there is no commercial market for 11(e)(2) waste. In sum, based on the trial testimony and the AR, the court concludes that plaintiff has failed to prove that there is a competitive market for radioactive waste disposal services.

Plaintiff also asserts that the Corps failed to conduct the necessary market research to determine whether commercial items were available to meet its requirements, *see* FAR

12.101(a), stating that "both the administrative record and the trial record are completely devoid" of evidence that the Corps considered the use of commercial items in this acquisition. The burden of proof, however, resides with plaintiff. *See Hoel–Steffen Const. Co. v. United States,* 231 Ct.Cl. 128, 684 F.2d 843, 848 (1982); *Keco Indus.,* 428 F.2d at 1233. Plaintiff has offered no evidence that the Corps failed to consider the use of commercial items. Moreover, even if plaintiff could show that the Corps did not conduct the required market research, the court would find this failure to be not prejudicial, in light of the court's finding that radioactive waste disposal is not a "commercial item." *See Central Ark. Maintenance,* 68 F.3d at 1342 (a protester must show, not only an error in the procurement process, but that the error was prejudicial).

### *Conclusion*

Defendant's motions to dismiss, in part, and for judgment on the administrative record, are granted. Plaintiff's motion for judgment on the administrative record is denied. The Clerk of the Court shall enter judgment in favor of defendant.