Justice Ginsburg,
with whom Justice Souter joins, dissenting.
The central question in this action under the National Environmental Policy Act of 1969 (NEPA) was whether the Navy must prepare an environmental impact statement (EIS). The Navy does not challenge its obligation to do so, and it represents that the EIS will be complete in January 2009 — one month after the instant exercises conclude. If the Navy had completed the EIS before taking action, as NEPA instructs, the parties and the public could have benefited from the environmental analysis — and the Navy’s training could have proceeded without interruption. Instead, the Navy acted first, and thus thwarted the very purpose an EIS is intended to serve. To justify its course, the Navy sought dispensation not from Congress, but from an executive council that lacks authority to countermand or revise NEPA’s requirements. I would hold that, in imposing manageable measures to mitigate harm until completion of the *44 EIS, the District Court conscientiously balanced the equities and did not abuse its discretion.
I
In December 2006, the Navy announced its intent to prepare an EIS to address the potential environmental effects of its naval readiness activities in the Southern California (SOCAL) Range Complex. See 71 Fed. Reg. 76639 (2006). These readiness activities include expansion and intensification of naval training, as well as research, development, and testing of various systems and weapons. Id., at 76639, 76640. The EIS process is underway, and the Navy represents that it will be complete in January 2009. Brief for Petitioners 11; Tr. of Oral Arg. 11.
In February 2007, seeking to commence training before completion of the EIS, the Navy prepared an environmental assessment (EA) for the 14 exercises it planned to undertake in the interim. See App. to Pet. for Cert. 235a.[1] On February 12, the Navy concluded the EA with a finding of no significant impact. App. 225-226. The same day, the Navy commenced its training exercises. Id., at 227 (“The Proposed Action is hereby implemented.”).
On March 22, 2007, the Natural Resources Defense Council, Inc. (NRDC), filed suit in the U. S. District Court for the Central District of California, seeking declaratory and injunctive relief based on the Navy’s alleged violations of NEPA and other environmental statutes. As relevant here, the District Court determined that NRDC was likely to succeed on its NEPA claim and that equitable principles warranted preliminary relief. On August 7, 2007, the court *45 enjoined the Navy’s use of mid-frequency active (MFA) sonar during the 11 remaining exercises at issue.
On August 31, the Court of Appeals for the Ninth Circuit stayed the injunction pending disposition of the Navy’s appeal, and the Navy proceeded with two more exercises. In a November 13 order, the Court of Appeals vacated the stay, stating that NRDC had shown “a strong likelihood of success on the merits” and that preliminary injunctive relief was appropriate. 508 F. 3d 885, 886 (2007). The Court of Appeals remanded, however, instructing the District Court to provide mitigation measures under which the Navy could conduct its remaining exercises.
On remand, the District Court received briefing from both parties. In addition, the court “toured the USS Milius at the naval base in San Diego, California, to improve its understanding of the Navy’s sonar training procedures and the feasibility of the parties’ proposed mitigation measures. Counsel for both [parties] were present.” 530 F. Supp. 2d 1110, 1112 (2008). On January 3, 2008, the District Court entered a modified preliminary injunction imposing six mitigation measures. The court revised the modified injunction slightly on January 10 in response to filings by the Navy, and four days later, denied the Navy’s application for a stay pending appeal.
On the following day, January 15, the Council on Environmental Quality (CEQ), an advisory body within the Executive Office of the President, responded to the Navy’s request for “alternative arrangements” for NEPA compliance. App. to Pet. for Cert. 233a. The “arrangements” CEQ set out purported to permit the Navy to continue its training without timely environmental review. Id., at 241a-247a. The Navy accepted the arrangements on the same day. App. 228.
The Navy then filed an emergency motion in the Court of Appeals requesting immediate vacatur of the District Court’s modified injunction. CEQ’s action, the Navy urged, *46 eliminated the injunction’s legal foundation. In the alternative, the Navy sought a stay of two aspects of the injunction pending its appeal: the 2,200-yard mandatory shutdown zone and the power-down requirement in significant surface ducting conditions, see ante, at 17-18 (opinion of the Court). While targeting in its stay application only two of the six measures imposed by the District Court, the Navy explicitly reserved the right to challenge on appeal each of the six mitigation measures. Responding to the Navy’s emergency motion, the Court of Appeals remanded the matter to allow the District Court to determine in the first instance the effect of the intervening executive action. Pending its own consideration of the Navy’s motion, the District Court stayed the injunction, and the Navy conducted its sixth exercise.
On February 4, after briefing and oral argument, the District Court denied the Navy’s motion. The Navy appealed, reiterating its position that CEQ’s action eliminated all justification for the injunction. The Navy also argued that vacatur of the entire injunction was required irrespective of CEQ’s action, in part because the “conditions imposed, in particular the 2,200 yard mandatory shutdown zone and the six decibel (75%) power-down in significant surface ducting conditions, severely degrade the Navy’s training.” Brief for Appellants in No. 08-55054 (CA9), p. 15. In the February 29 decision now under review, the Court of Appeals affirmed the District Court’s judgment. 518 F. 3d 658, 703 (2008). The Navy has continued training in the meantime and plans to complete its final exercise in December 2008.
As the procedural history indicates, the courts below determined that an EIS was required for the 14 exercises. The Navy does not challenge that decision in this Court. Instead, the Navy defends its failure to complete an EIS before launching the exercises based upon CEQ’s “alternative arrangements” — arrangements the Navy sought and obtained in order to overcome the lower courts’ rulings. As *47 explained below, the Navy’s actions undermined NEPA and took an extraordinary course.
II
NEPA “promotes its sweeping commitment” to environmental integrity “by focusing Government and public attention on the environmental effects of proposed agency action.” Marsh v. Oregon Natural Resources Council, 490 U. S. 360, 371 (1989). “By so focusing agency attention, NEPA ensures that the agency will not act on incomplete information, only to regret its decision after it is too late to correct.” Ibid.
The EIS is NEPA’s core requirement. Department of Transportation v. Public Citizen, 541 U. S. 752, 757 (2004). This Court has characterized the requirement as “action-forcing.” Andrus v. Sierra Club, 442 U. S. 347, 350 (1979) (internal quotation marks omitted). Environmental concerns must be “integrated into the very process of agency decisionmaking” and “interwoven into the fabric of agency planning.” Id., at 350-351. In addition to discussing potential consequences, an EIS must describe potential mitigation measures and alternatives to the proposed course of action. See Robertson v. Methow Valley Citizens Council, 490 U. S. 332, 351-352 (1989) (citing 40 CFR §§ 1508.25(b), 1502.14(f), 1502.16(h), 1505.2(c) (1987)). The EIS requirement “ensures that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast.” 490 U. S., at 349.
“Publication of an EIS . . . also serves a larger informational role.” Ibid. It demonstrates that an agency has indeed considered environmental concerns, and “perhaps more significantly, provides a springboard for public comment.” Ibid. At the same time, it affords other affected governmental bodies “notice of the expected consequences and the opportunity to plan and implement corrective measures in a timely manner.” Id., at 350.
*48 In light of these objectives, the timing of an EIS is critical. CEQ regulations instruct agencies to “integrate the NEPA process with other planning at the earliest possible time to insure that planning and decisions reflect environmental values.” 40 CFR § 1501.2 (1987). An EIS must be prepared “early enough so that it can serve practically as an important contribution to the decisionmaking process and will not be used to rationalize or justify decisions already made.” Andrus, 442 U. S., at 351-352, n. 3 (quoting 43 Fed. Reg. 55995 (1978) (codified in 40 CFR § 1502.5 (1979))).
The Navy’s publication of its EIS in this case, scheduled to occur after the 14 exercises are completed, defeats NEPA’s informational and participatory purposes. The Navy’s inverted timing, it bears emphasis, is the very reason why the District Court had to confront the question of mitigation measures at all. Had the Navy prepared a legally sufficient EIS before beginning the SOCAL exercises, NEPA would have functioned as its drafters intended: The EIS process and associated public input might have convinced the Navy voluntarily to adopt mitigation measures, but NEPA itself would not have impeded the Navy’s exercises. See Public Citizen, 541 U. S., at 756, 769, n. 2 (noting that NEPA does not mandate particular results, but rather establishes procedural requirements with a “focus on improving agency decisionmaking”).
The Navy had other options. Most importantly, it could have requested assistance from Congress. The Government has sometimes obtained congressional authorization to proceed with planned activities without fulfilling NEPA’s requirements. See, e.g., Floyd D. Spence National Defense Authorization Act for Fiscal Year 2001, Pub. L. 106-398, §317, 114 Stat. 1654A-57 (exempting the military from preparing a programmatic EIS for low-level flight training); 42 U. S. C. § 10141(c) (2000 ed.) (exempting the Environmental Protection Agency from preparing an EIS for the development of criteria for handling spent nuclear fuel and high- *49 level radioactive waste); 43 U. S. C. § 1652(d) (exempting construction of the trans-Alaska oil pipeline from further NEPA compliance).
Rather than resorting to Congress, the Navy “sought relief from the Executive Branch.” Ante, at 18 (opinion of the Court). On January 10, 2008, the Navy asked CEQ, adviser to the President, to approve alternative arrangements for NEPA compliance pursuant to 40 CFR §1506.11 (1987). App. to Pet. for Cert. 233a; see ante, at 18, n. 3. The next day, the Navy submitted supplementary material to CEQ, including the Navy’s EA and after-action reports, the District Court’s orders, and two analyses by the National Marine Fisheries Service (NMFS). App. to Pet. for Cert. 237a-238a. Neither the Navy nor CEQ notified NRDC, and CEQ did not request or consider any of the materials underlying the District Court orders it addressed.
Four days later, on January 15, the Chairman of CEQ issued a letter to the Secretary of the Navy. Repeating the Navy’s submissions with little independent analysis, the letter stated that the District Court’s orders posed risks to the Navy’s training exercises. See id., at 238a (“You have explained that the training restrictions set forth in the . . . injunctive orders prevent the Navy from providing Strike Groups with adequate proficiency training and create a substantial risk of precluding certification of the Strike Groups as combat ready.”).
The letter continued:
“Discussions between our staffs, your letter and supporting documents, and the classified declaration and briefings I have received, have clearly determined that the Navy cannot ensure the necessary training to certify strike groups for deployment under the terms of the injunctive orders. Based on the record supporting your request . . . CEQ has concluded that the Navy must be able to conduct the [exercises] ... in a timeframe that does not provide sufficient .time to complete an EIS. *50 Therefore, emergency circumstances are present for the nine exercises and alternative arrangements for compliance with NEPA under CEQ regulation 40 C. F. R. § 1506.11 are warranted.” Id., at 240a.
The alternative arrangements CEQ set forth do not vindicate NEPA’s objectives. The arrangements provide for “public participation measures,” which require the Navy to provide notices of the alternative arrangements. Id., at 241a, 242a. The notices must “seek input on the process for reviewing post-exercise assessments” and “include an offer to meet jointly with Navy representatives . . . and CEQ to discuss the alternative arrangements.” Id., at 242a-243a. The alternative arrangements also describe the Navy’s existing research and mitigation efforts. Id., at 243a-247a.
CEQ’s hasty decision on a one-sided record is no substitute for the District Court’s considered judgment based on a two-sided record.[2] More fundamentally, even an exemplary CEQ review could not have effected the short circuit the Navy sought. CEQ lacks authority to absolve an agency of its statutory duty to prepare an EIS. NEPA established CEQ to assist and advise the President on environmental policy, 42 U. S. C. § 4342, and a 1977 Executive Order charged CEQ with issuing regulations to federal agencies for implementation of NEPA’s procedural provisions, Exec. Order No. 11991, 3 CFR 123 (1977 Comp.). This Court has recognized that CEQ’s regulations are entitled to “substantial deference,” Robertson, 490 U. S., at 355, and 40 CFR § 1506.11 indicates that CEQ may play an important consultative role in emergency circumstances, but we have never suggested that CEQ could eliminate the statute’s command. If the *51 Navy sought to avoid its NEPA obligations, its remedy lay in the Legislative Branch. The Navy’s alternative course— rapid, self-serving resort to an office in the White House — is surely not what Congress had in mind when it instructed agencies to comply with NEPA “to the fullest extent possible.” 42U.S.C. §4332.[3]
Ill
A
Flexibility is a hallmark of equity jurisdiction. “The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it.” Weinberger v. Romero-Barcelo, 456 U. S. 305, 312 (1982) (quoting Hecht Co. v. Bowles, 321 U. S. 321, 329 (1944)). Consistent with equity’s character, courts do not insist that litigants uniformly show a particular, predetermined quantum of probable success or injury before awarding equitable relief. Instead, courts have evaluated claims for equitable relief on a “sliding scale,” sometimes awarding relief based on a lower likelihood of harm when the likelihood of success is very high. 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2948.3, p. 195 (2d ed. 1995). This Court has never rejected that formulation, and I do not believe it does so today.
Equity’s flexibility is important in the NEPA context. Because an EIS is the tool for uncovering environmental harm, environmental plaintiffs may often rely more heavily on their probability of success than the likelihood of harm. The Court is correct that relief is not warranted “simply to prevent the possibility of some remote future injury.” Ante, *52 at 22 (quoting Wright & Miller, supra, §2948.1, at 155). “However, the injury need not have been inflicted when application is made or be certain to occur; a strong threat of irreparable injury before trial is an adequate basis.” Wright & Miller, supra, §2948.1, at 155-156 (footnote omitted). I agree with the District Court that NRDC made the required showing here.
B
The Navy’s own EA predicted substantial and irreparable harm to marine mammals. Sonar is linked to mass standings of marine mammals, hemorrhaging around the brain and ears, acute spongiotic changes in the central nervous system, and lesions in vital organs. E. g., App. 600-602; id., at 360-362, 478-479. As the Ninth Circuit noted, the EA predicts that the Navy’s “use of MFA sonar in the SOCAL exercises will result in 564 instances of physical injury including permanent hearing loss (Level A harassment) and nearly 170,000 behavioral disturbances (Level B harassment), more than 8,000 of which would also involve temporary hearing loss.” 518 F. 3d, at 696; see App. 223-224. Within those totals,
“the EA predicts 436 Level A harassments of Cuvier’s beaked whales. According to [the National Oceanic and Atmospheric Administration (NOAA)], as few as 1,121 . . . may exist in California, Oregon and Washington combined. Likewise, the EA predicts 1,092 Level B harassments of bottlenose dolphins, of which only 5,271 may exist in the California Coastal and Offshore stocks.” 518 F. 3d, at 691-692.
The majority acknowledges the lower courts’ findings, ante, at 19, but also states that the EA predicted “only eight Level A harassments of common dolphins each year” and “274 Level B harassments of beaked whales per year, none of which would result in permanent injury,” ante, at 16. Those numbers do not fully capture the EA’s predictions.
*53 The EA classified the harassments of beaked whales as Level A, not Level B. The EA does indeed state that “modeling predicts non-injurious Level B exposures.” App. 185. But, as the majority correctly notes, ante, at 16, the EA also states that “all beaked whale exposures are counted as Level A,” App. 185. The EA counted the predicted exposures as Level A “[b]y Navy policy developed in conjunction with NMFS.” Id., at 200. The record reflects “the known sensitivity of these species to tactical sonar,” id., at 365 (NO A A letter), and as the majority acknowledges, beaked whales are difficult to study, ante, at 16. Further, as the Ninth Circuit noted, “the EA . . . maintained that the methodology used was based on the ‘best available science.’” 518 F. 3d, at 669.[4]
In my view, this likely harm — 170,000 behavioral disturbances, including 8,000 instances of temporary hearing loss; and 564 Level A harms, including 436 injuries to a beaked whale population numbering only 1,121 — cannot be lightly dismissed, even in the face of an alleged risk to the effectiveness of the Navy’s 14 training exercises. There is no doubt that the training exercises serve critical interests. But those interests do not authorize the Navy to violate a statutory command, especially when recourse to the Legislature remains open. “Of course, military interests do not always trump other considerations, and we have not held that they do.” Ante, at 26.
In light of the likely, substantial harm to the environment, NRDC’s almost inevitable success on the merits of its claim *54 that NEPA required the Navy to prepare an EIS, the history of this litigation, and the public interest, I cannot agree that the mitigation measures the District Court imposed signal an abuse of discretion. Cf. Amoco Production Co. v. Gambell, 480 U. S. 531, 545 (1987) (“Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i. e., irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment.”).
For the reasons stated, I would affirm the judgment of the Ninth Circuit.

 An EA is used “for determining whether to prepare” an EIS. Department of Transportation v. Public Citizen, 541 U. S. 752, 757 (2004) (quoting 40 CFR § 1508.9(a) (2003)); see ante, at 15-16 (opinion of the Court). By definition, an EA alone does not satisfy an agency’s obligation under NEPA if the effects of a proposed action require preparation of a full EIS.

 The District Court may well have given too spare an explanation for the balance of hardships in issuing its injunction of August 7, 2007. The court cured any error in this regard, however, when it closely examined each mitigation measure in issuing the modified injunction of January 3, 2008. The Court of Appeals, too, conducted a detailed analysis of the record.

 On the same day that CEQ issued its letter, the President granted the Navy an exemption from the requirements of the Coastal Zone Management Act of 1972 (CZMA) pursuant to 16 U. S. C. § 1456(c)(1)(B) (2006 ed.). That exemption, expressly authorized by the CZMA, does not affect NRDC’s NEPA claim.

 The majority reasons that the environmental harm deserves less weight because the training exercises “have been taking place in SOCAL for the last 40 years,” such that “this is not a ease in which the defendant is conducting a new type of activity with completely unknown effects on the environment.” Ante, at 23. But the EA explains that the proposed action is not a continuation of the “status quo training.” App. 128. Instead, the EA is based on the Navy’s proposal to employ a “surge” training strategy, ibid., in which the commander “would have the option to conduct two concurrent major range events,” id., at 124.